in their place, asks for no relief which any court would incorporate into a decree. Whatever coercive measures might be necessary to enforce a decree will be determined after refusal to comply, and not in anticipation of such refusal.

It follows that the demurrers must be sustained and the complaint dismissed, with costs to each defendant separately demurring, but one bill of costs, however, being taxed in favor of all defendants appearing by the same attorney, with leave to the plaintiff to amend his complaint within 20 days upon payment of costs.

(111 App. Div. 789)

## TOWN OF NORTH HEMPSTEAD v. ELDRIDGE.

(Supreme Court, Appellate Division, Second Department. March 2, 1906.)

1. PUBLIC LANDS—PATENTS—CONSTRUCTION—LAND UNDER WATER.

The Kieft patent of 1664, to the town of Hempstead granted a certain quantity of land on Long Island, with all the havens, harbors, rivers, creeks, woodland, marshes, and all other appurtenances, from the East river to the South sea, from Hempstead Bay westward as far as Matthew Garretson's Bay, to begin at the head of said two bays, and so to run in direct lines that there may be the same latitude in breadth on the south side as on the north. *Held*, that such patent conveyed a body of land stretching across the island, partly bounded by high-water mark in Hempstead Bay and Matthew Garretson's Bay, but did not include land under water in either of such bays.

2. SAME—PUBLIC GRANTS—EXTENT—BURDEN OF PROOF.

A claimant of land under a gratuitous grant from the sovereign is bound to show that the land in question is clearly within the language of his grant.

3. SAME.

History and public grants of land to the town of North Hempstead, Long Island, construed, and *held* insufficient to convey to the town land under water situated south of Saddle Rock in the east part of Matthew Garretson's Bay on the north shore of Long Island.

Appeal from Special Term, Kings County.

Action by the town of North Hempstead against Louise U. Eldridge. From a judgment dismissing the complaint, plaintiff appeals. Affirmed on the opinion of Stephen H. Olin, referee.

The following is the opinion of the referee:

This is an action of ejectment. The plaintiff seeks to recover about 9.81 acres of land under water now in possession of the defendant, who is owner of the adjoining upland. This land is situated south of Saddle Rock in the east part of Little Neck Bay (formerly Matthew Garretson's Bay) in the town of North Hempstead, county of Nassau. Little Neck Bay is on the north shore of Long Island opening from Long Island Sound, and is divided at its head by a small peninsula now called "Little Neck." The plaintiff bases its claim upon patents from the Dutch governor, Kieft, and the English governors, Nicolls and Dongan. Until 1785 the town of Hempstead ran from north to south across the island. By chapter 21, Laws 1785, the town of North Hempstead was set off by an east and west line and became vested with the right and title of the old town of Hempstead to the lands within its boundaries including those adjacent to the sound. North Hempstead v. Hempstead, 2 Wend. 112. It is not disputed that the town of Hempstead acquired the legal title to land under water within the bounds of its patents (Roe v. Strong, 107 N. Y. 358, 14 N. E. 294), and the question is whether the disputed land falls within the boundaries of the

grants to the town. The plaintiff contends that substantially one-half of the land under water in Little Neck Bay was granted to the town of Hempstead; that the plaintiff's westerly boundary line, under its patents, begins at the head or middle of Matthew Garretson's Bay (Little Neck Bay) at a point in the middle or furthest projection of the small peninsula known as Little Neck and runs thence on a direct north line to the sound or east river.

The defendant claims that the lands under water in this bay were never granted to the town, and that the title thereto remained in the sovereign and is now in the state or its grantees. The defendant contends that the point of departure for the west boundary of the town lands is not to be found on the peninsula of Little Neck, but at the head of the bay to the east of the peninsula and that the line runs northward along high-water mark to the sound, excluding all lands under water. On November 16, 1644, Gov. Kieft issued for the town of Hempstead a patent to certain named persons by which he granted to them: "A certaine quantity of land, with all the havens, harbors, rivers, creekes, woodland, marshes, and all other appurtenances thereunto belonging, lying and being upon and about a certaine place called the Great Plaines on Long Island, from the East River to the South Sea, and from a certain harbor now commonly called and knowne by ye name of Hempstead Bay, and so westward as far as Matthew Garretson's Bay, to begin at the head of the said two bayes, and so to run in direct lines, that there may be the same latitude in breadth on the south side as on the north, for them, the said patentees, actually, really and perpetually to enjoy in as large and ample manner as their owne free lands of inheritance, and as farr eastward." Pamphlet Containing Colonial Grants Published by Geo. L. Rives, Corporation Counsel, p. 84. On March 16, 1666, a patent of Gov. Nicolls recited as follows: "Whereas, there is a certaine towne in the north riding of Yorkshire, upon Long Island, commonly called and knowne by the name of Hempstead, situate lying and being on the south side of the grate plaines, having a certaine tract of land thereunto belonging, bounds whereof on the northeast side begin at the northwest part of the land commonly called Robert Williams purchase, so running on a direct south line to the southermost part of the said lands (which by computacon is to the middle of the Great Plaines); it extends thence east to the utmost limitts of the said Plaines, and so stretcheth againe south to the sea from the northeast bounds aforementioned, a west line being rune to the head or middle of Mathew Garretson's Bay, it makes theire north bounds; from whence running southward to the sea; they are bounded to west by the east limitts of the townes of Flushing and Jamaica, and south by the sea or maine ocean." Id. p. 47. This patent was given as a "confirmacon" of the Kieft patent, and it conveys "all the aforementioned tract and neck of land, set forth and bounded as aforesaid, together with all havens, harbors, creekes, quarryes * * * waters, lakes, rivers, fishing, hawking, hunting and fowling, * * * to the said towne, tract of land and premises within the limits and bounds aforementioned described, belonging or in any wise appertaining." In the following year, 6th March, 1667, Gov. Nicolls signed a new patent modifying the former one by including in the north bounds of the town certain lands at Matinicock on the east side of Hempstead Harbor. This patent was recalled and is important only as an aid to interpreting its predecessor. Id. p. 50. On April 16, 1685, Gov. Dongan gave a patent reciting: "Whereas, there is a certaine town in Queens County, called and known by the name of Hempstead upon Long Island, situate lying and being on the south side of the Great Plaines, having a certain tract of land thereunto belonging, the bounds whereof begin at a marked tree standing at the head of Mattegarretts Bay, and so running and thence upon a direct south line due south to the main sea, and from the said tree a direct north line to the south or east River, and so around the points of the necks until it comes to Hempstead Harbour, and so up the Harbour to a certaine barr or sandy beach; and from thence up a direct line until it comes to the marked tree on the east side of Contiagge Point; and from thence a southerly line to the utmost extent of the Great Plaines, and from thence upon a straight line to a certaine tree marked in the neck called Maskachoung; and so from thence upon a due south line to the South Sea, and the said South Sea is to be the south bounds from the east line to the west line, and the Sound or East River to be the northerly bounds as according to the

several deeds or purchases from the Indian owners and the patent from the Dutch Governor William Kieft, relacon thereto being had doth more more fully and at large appear." Id. p. 52.

The plaintiff contends that the point described by Dongan as the "head of Mattegarretts Bay," by Nicolls as "ye head or ye middle of Mathew Garretson's Bay," and by Kieft as "the head" of Matthew Garretson's Bay, can only be found at the middle or furthest projection of the peninsula now known as Little Neck. The defendant insists that, ex vi termini, the point so described must be sought at the head of one of the smaller bays into which Little Neck Bay divides and that the head of the small bay on the east side of Little Neck appears to a person standing there to be the middle of Little Neck Bay—an appearance which in the absence of actual survey might have been taken as fact by the draftsmen of the patents. The arguments on this point, however ingenious, appear to me inconclusive, and the location of the westerly boundary of Hempstead must be ascertained, not from these patents alone, but by reference to a series of acts, declarations, and patents relating to all the boundaries of the town. The Kieft grant in 1664 of "a certain quantity of land, with all the havens, harbours, Rivers, Creekes, woodland, marshes and all other appurtenances from the East River to the South Sea" from Hempstead Bay "westward as far as Matthew Garretson's Bay" to begin at the head of the said two bays, and so to run in direct lines, that there may be the same latitude in breadth on the south side as on the north," according to settled rules of interpretation, conveyed a body of land stretching across the island partly bounded by high-water mark in Hempstead Bay and Matthew Garretson's Bay, and did not include land under water in either of these bays. People ex rel. Underhill v. Saxton, 15 App. Div. 263, 269, 44 N. Y. Supp. 211, affirmed 154 N. Y. 748, 49 N. E. 1102; Gerard's Title to Real Estate (3d Ed.) 57; Gould v. H. R. R. R. Co., 6 N. Y. 522.

It should be noted that the words "and as farr Eastward" at the end of the description in Kieft's patent were taken as granting a tract of land running across the island equal in width to the tract already described. The northeast boundary of this tract was undetermined and became the subject of further action. On October 10th of the year 1645, Gov. Kieft gave a patent to the town of Flushing of lands "to run Eastward as farr as Matthew Garretson's Bay * * * being bounded * * * on the eastward part thereof with the land granted to ye plantations and towne of Hempstead, and so to runn in two direct lines into the south side of ye said Island, that there may be the same latitude in breadth on the south side as on the north side," etc. Law Department Pamphlet. p. 81. Before the ensealing of this patent it was ordered that the "land should runne north and south but as farr as the hills." Taking these two patents together title to the land under Little Neck Bay remained in the sovereign. On the 23d of January, 1657, the inhabitants of Flushing protested to the governor against "the intrusion of the men of Hempstead on the east part of our bounded." "Some overture has been made for redress to the late Gouvernour Kiffet" but nothing was done in the business. Documents Relating to the Colonial History of New York, vol 14, p. 384. On May 11, 1658, an Indian deed was made to the "magistrate and inhabitants of Hempstead" for a tract of land with a western boundary "beginning at a place called Mattagarretts Bay and soe running upon a direct line north and south from sea to sea," etc. Thompson's History of Long Island, p. 10.

At a "General Towne Meeting of the Town of Hempstead, December ye 14th, 1663," it was voted that: "Mr. Seamans, Mr. Jackson and Henry Persall shall forthwith lay out the lands at Matthew Garrison's Bay and eastward at Matinacock in perticuler alotments." 1 North & South Hempstead Town Records. 147, 148. In January, 1664, Gov. Nicolls addressed a letter to the towns of Hempstead, Flushing and Jamaica. That written to "ye Constable and Overseers of the Town of Hempstead" was as follows: "Genl.: The time within wch yor respective Pattents are to be renewed and confirmed, drawing on, to pr vent misinformacon concerning the Limitts and Bounds of yor several towns, and to take away all occasions of future cavills and contests, wch otherwise might arise, I have thought fitt to direct you, to appoint one or more from yor Towne, to Meete * * * at Jamaica, to whom you are to give full instructions concerning yor certaine Bounds and Limitts. * * *" Thirty-

four delegates attended this meeting, which took place at Hempstead on February 28th. Documents relating to the Colonial History of New York, vol. 14, p. 592; Lamb's History of New York, vol. 1, pt. 1, p. 227, On March 2, 1664, at this "general meeting of the deputyes of Long Island held before the Governour at Hempstead" it was ordered "that a lyne shall be drawne to run through the middle of the hills * * * between the townes of Flushing and Jamaica east and west, parallel with the lyne of Flushing, which shall be the bounds of each town." Law Department Pamphlet, p. 88. At the same general meeting, but on March 3, 1664, the record recites: "Whereas the towne of Jamacia doth lay claim to the Little Plaines, which towne the of Hempstead alleadge to be within their pattent: Now, in regard the said towne of Jamaica have for nine years past enjoyed the said Plaines without molestation, and can not subsist without them, neither is it knowne whether they are within the bounds of Hempstead Patent, it is this day ordered that the lyne of Hempstead bounds being drawn from the head of Mathew Garretsons Bay (which is to say the middle of the said Bay) to run directly to the South Sea, what part of the said Little Plaines the said lyne doth not comprehend to be within the bounds of Hempstead shall be and remain to the towne of Jamaica, and if any part thereof shall be within the bounds of Hempstead in regard they are sufficiently provided, and Jamaica hath great necessity thereof, upon neighborly and moderate townes (terms?), the towne of Jamaica shall likewise be possessed thereof by sale or assignmt from the towne of Hempstead." Id. p. 89. At the same "generall Meeting" in March, 1664, the line between Flushing and Hempstead was fixed, and the land of Flushing was declared "to run eastward as far as Matthew Garretson's Bay, from the head or middle whereof a line is to be run southeast in length, about three miles, and two miles, in breadth," etc. This appears from a recital in the Dongan charter to Flushing, to be hereafter referred to. On May 1, 1665, in pursuance of the order made at the "Generall Meeting" in March, 1664, a Hempstead town meeting "condescended" that their "Loving ffriends, The inhabitants of Jamaica" should have "all the little Plaines which our Line doth comprehend, and all the Meadow that lyes below the little Plaines that is to say the Meadow which lyes on the west side of the Great River which comes out of the Great Swamp." 1 North & South Hempstead Town Records, 178.

Thus, in 1664, the boundaries of Flushing, Jamaica, and Hempstead, left uncertain by the Kieft patents, had been defined and established by the English governor at Hempstead in the presence of the Long Island deputies, and he could now proceed to issue patents accordingly. On February 15, 1666, Gov. Nicolls granted a patent to Flushing of land "to runne eastward as farr as Matthew Garretson's Bay from the head or middle whereof a line is to be runne southeast in length about three miles, and about two miles in breadthe, as the line hath been surveyed and laid out by vertue of an order made at the Genall. Meeting held at ye town of Hempstead in the moneth of March, 1664; thence (that there may bee the same latitude in breadth on the south side as on the north) to runne in two direct lines southward as is directed by another order made at the generall meeting aforesaid wh passing east and west as the trees are now markt is the bounds between ye said towne of Flushing and Jamaica." Law Department Pamphlet, p. 30. The town of Hempstead had conferred upon Thomas Hicks certain lands lying on Little Neck (then called Mad Nance's Neck) which neck had been "heretofore reputed to bee within the limitts of the Towne of Hempstead." Gov. Nicolls on February 20, 1666, gave Hicks a patent confirming his title and granting him all the neck, "Provided that the lotts and Plantations which shall be settled upon the said neck have relacon to the Towns of Flushing," according to the order made at the general meeting at Hempstead in March, 1664. In March, 1666, therefore, when Gov. Nicolls issued his patent to the town of Hempstead, the western boundary of Hempstead had been laid down, partly by orders of the governor in general assembly of the deputies of Long Island, and partly by acts of the town of Hempstead. It no longer ran from the head of Matthew Garretson's Bay on a direct line southward, but ran southeast for three miles from Matthew Garretson's Bay, where it bordered on the grant to Flushing, and further south it ran along the eastern boundary of the Little Plains, which belonged to Jamaica. Gov. Nicolls, at least, recognized the whole of

Little Neck as having relation to the "Towne of Flushing." The eastern boundary of Hempstead had also ceased to be a direct line drawn north and south. The Nicolls patent follows the new east line as settled. It then says: "A west line being rune to the head or middle of Mathew Garretson's Bay, it makes their north bounds."

It cannot be supposed that this line, although called a "west line," was drawn due east and west, so as to exclude the lands of Great Neck. A line running in a general westerly direction, but following the northern limits of the town along the sound, must have been intended. As to these northern limits no controversy had arisen or seemed likely to arise. The western line is given as running from the head or middle of Matthew Garretson's Bay "southward to the sea; they are bounded to the west by the townes of Flushing and Jamaica, and South by the sea or Maine Ocean." On November 23, 1675, Gov. Andros made an order reciting that, whereas, in Gov. Nicolls' time Cornsbury, or Little Madnan's Neck (now Little Neck) where Capt. Thomas Hicks resides, "was adjudged to be within the limitts of Flushing, since the which the line having been runn. It hath been found that part of the land on the said Neck, belonging to Capt. Thomas Hicks, is within the bounds of Hempstead * * * These are to declare that from and after the date hereof, the farm and land upon Cornbury belonging to the said Capt. Hicks, shall be deemed and held to be within the Bounds and Limitts of Hempstead and not longer of Flushing." Vol. 14 of Documents Relating to the Colonial History of New York, p. 707. On March 23, 1685, Gov. Dongan gave to the town of Flushing a "patent and confirmation" of the Nicolls patent, using substantially the same words of description therein found. He recited an agreement between Flushing and Jamaica, dated March 6, 1679/80, whereby the boundary between those towns had been ascertained and continued as follows: "And whereas by another certaine writing or agreement, dated the last day of June, one thousand six hundred and eighty-fouer, made by Elias Doughty, John Seaman, Thomas Willett and John Jackson, with the bounds between the towne of Flushing and Hempstead, are to begin at the middle of the Bay where Capt. Jacques runne the line, and to hold the same until it comes to the land called by the name of the Governor's land, and then from the South side of the Governor's land towards the end of the Plaine to former marked tree which stands in the hollow, and to runne from thence upon a direct line until the Rocky Hill, westerly where carts usually goe to Flushing * * ** And, whereas, applicacon has been made to me * * * for confirmation of the aforesaid tract or parcel of land and premises contained in the aforesaid patent, as it has since been limited, butted and bounded by the aforementioned agreements of the town of Flushing with the towns of Jamaica and Hempstead." And the patent confirms and grants "all the before recited tract or parcell or neck of land set forth, limited and bounded as aforesaid by the aforementioned patent, Indian deed of sale and agreements." Law Department Pamphlet, p. 35. When in the following month and on April 17, 1685, Gov. Dongan gave a patent to Hempstead of land bounded on the west beginning "at a marked tree standing at the head of Mattegarretts Bay, and so running and thence upon a direct south line due south to the main sea," he was, if these words are taken literally, infringing upon the "established rights and bounds of the Towne of Flushing." On June 2, 1686, at a town meeting in Hempstead, the patentees and others were directed to "use their best endever to maintayn the Jenerall bounds of our townd both of Purchis and Pattin and as for the west bounds of our townd which is beginning at mathagarats bay hed and from thence a south line to the See and a North Line to the Sound there being formerly a contrevarsy which was the hed of the bay and at the Jenerall Metting that was held at our townd by Governor Nicols and the Cuntrys debtys the thing desided and ordered by the athority afforesaid that the Middill of the said bay that is Nere the bottum of the little Neck should be a Counted for the Hed of the said bay where then was a tree marked fer our west bounds betwen flushing and us from which tree or Please Wee dwo Order and impower our agents afferesaid to use their best indevour to maintayn a south Line to the see and a North Line to the Sound." 2 Hempstead Town Records, 8.

By chapter 4 of the Laws of 1797 (amendatory of chapter 69, tit. 9, Laws

1797), the town supervisors in the different counties were directed to cause surveys of their respective towns to be made and filed in the surveyor general's office. Pursuant to this act and in the year 1797 maps, respectively, of North Hempstead, Flushing, and Hempstead by Wm. M. Stewart, surveyor, were filed. The boundary between these towns runs southeast from Little Neck Bay about three miles, passes the end of the plains (now Floral Park) and goes to the "Rocky Hill," which was a point of departure for the boundary between Flushing and Jamaica. The line was thus drawn, as it had been settled in the general meeting of March, 1664, and as it now exists between the borough of Queens and the county of Nassau. The boundaries shown by these maps seem to correspond with the bounds of the Nicolls patents as modified and established by the agreements between Flushing, Hempstead, and Jamaica recited in the Dongan patent to Flushing. It follows that the point "at the middle of the Bay where Capt. Jacques runne the line" is the point where the present boundary between Queens and Nassau reaches Little Neck Bay, at the head of the small bay to the east of Little Neck. Is this the point which the town meeting in 1686 called "the middle of the said Bay, that is nere the bottum of the littell Neck"? This language is not perfectly clear, but it is certain that neither the town nor Gov. Andros or Gov. Dongan could, in 1676 or 1686, move this boundary westward into territory already belonging to Flushing by patent and agreement. In 1691 August Graham filed a survey of a due south line by the compass (allowing no variation) from a certain "Burch tree marked with the letter "H" near Hicks' Mill. This line seems to have been run with reference to some controversy as to land in Rockaway. Graham's line fell to the eastward of one previously run by a Mr. Wells. On May 8 and 9, 1727, Justice John Treadwell and other citizens "pursuant to voat made by the mager voat of the freeholders of Hempstead did aid and assist Dr. Colding ye Jeneral Survaior of the province of Neu York. In Running of our West Line which is our west bonds according to our purches and patians which is a derect South line due South from the head of mattheugarison's bay to the South Sea, beginning at a burch tree at ye sd bay head." 3 Town Records, 88. Apparently, from the account of the line as drawn, this survey agreed with that of Mr. Wells, and not with that of Graham, who had allowed for no variation of the compass.

The map filed by Graham shows that the tree marked "H" used by him was on Little Neck. It does not appear by whom or when the tree was marked. To settle questions arising on the south side of the island regarding lands not affected by the agreements made as to the boundary between Hempstead and Flushing, it was apparently deemed unnecessary to take into account the line which "Capt. Jacques runne" and which had been adopted by agreement in June 30, 1684, and I do not think that the evidence furnished by the Graham map can be taken to modify the conclusions already reached. It may be said, further, that Graham's north line (and still more Mr. Wells' north line) drawn from the marked tree on Graham's map passes eastward of high-water mark of the upland on Great Neck adjacent to the defendant's land under water, so that a north line, drawn from the tree marked by Graham, would not give the disputed premises to the plaintiff. The Dongan patent to Hempstead, as had been said, runs "from the said tree a direct north line to the South or East River, and so around the points of the Necks until it comes to Hempstead Harbour," etc. The Kieft patent had given to Hempstead the lands from Hempstead Bay "westward as far as Mathew Garretson's Bay"—that is to say, the whole of Great Neck; but it appears that a straight line due north from either of the points claimed to be the head of the bay would cut off portions of Great Neck. Hence the line could not be literally a "direct north line," and must be either a line following the shore or else a line drawn out into the bay to the west of north. Taking the point of departure as at the head of the bay east of Little Neck, where the boundary had been established by the patent to Flushing, it would be necessary to run the line almost northwest to inclose within the Hempstead boundary any considerable part of the surface of the bay. Why should such a line be described as a "direct north line"? How far into the waters of the sound should such a line be protracted before turning "around the points of the necks until it comes to Hempstead Harbor"?

A claimant under a gratuitous grant from the sovereign must bring himself within clear and unequivocal language, and the uncertainty of this line drawn to the sound seems to me fatal to the plaintiff's claim. Langdon v. Mayor, 93 N. Y. 145. I think, therefore, that the direct "north line" is to be taken as starting directly north and following the shore of the land belonging to Hempstead in a general northerly direction, just as the "direct south line due south to the main sea" must, without doubt, be taken as running first southeast, then south, southwest, and south again along the established boundary of the town of Flushing and the line which "Capt. Jacques runne." It is to be noticed that the boundaries of the town of Hempstead, as shown on Stewart's map, filed in 1797, include no land under water, nor is there evidence showing claim of title by the town before the year 1889 to any lands covered by the waters of Little Neck Bay. By chapter 231, p. 276, Laws 1835, Richard Udall was authorized to build a dock on the west side of Great Neck, extending into Little Neck Bay not more than 400 feet beyond high-water mark. This dock was built near the lands under water occupied by the defendant, and existed for years, so far as appears, without protest from the town of North Hempstead.

My conclusion is that the land under water described in the complaint is not included within the boundaries of either of the colonial patents to the town of Hempstead, and is not shown to be the property of the plaintiff, and for this reason the complaint should be dismissed.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, and RICH, JJ.

Henry Warren Beebe, for appellant.
George W. Davison, for respondent.

PER CURIAM. Judgment affirmed, with costs, upon the opinion of Stephen H. Olin, Esq., referee.

---

(112 App. Div. 39)

### PEOPLE v. WICKES.

(Supreme Court, Appellate Division, First Department. March 23, 1906.)

1. THREATS—ELEMENTS OF OFFENSE—EVIDENCE—SUFFICIENCY.

An attorney employed to prosecute an action for a contingent fee, wrote, under an assumed name, to defendant several letters, urging a settlement, and stating that a certified copy of the answers had been obtained, that they might be laid before a magistrate and an application made for a warrant for perjury, or the trial judge might send the answers to the district attorney, and inquiring whether he desired to have it known in the community that he had resorted to perjury, and averring that there was only one chance to escape conviction and that was to settle the case. *Held* to warrant the attorney's conviction of blackmail, it appearing that he attempted to obtain a settlement by threats of a prosecution for perjury and thereby obtain a fee.

2. SAME—DEFENSE.

It is no defense to a charge of blackmail that the crime threatened to be charged has been perpetrated, nor that accused has cause to believe that the crime has been committed or does believe it.

[Ed. Note.—For cases in point, see vol. 45, Cent. Dig. Threats, § 5.]

3. SAME.

An attorney employed to prosecute an unliquidated claim on a contingent fee wrote under an assumed name to defendant urging a settlement and threatening him with a prosecution for perjury. *Held*, that the privilege of an attorney did not constitute a defense to the attorney's prosecution for blackmail.