### GRACE v. TOWN OF NORTH HEMPSTEAD. .

(Supreme Court, Appellate Division, Second Department. February 26, 1915.)

1. NAVIGABLE WATERS ⬅️36—LAND UNDER BAY—PATENT.
The patent of 1685 to the town of Hempstead, which describes part of the boundary as running north "to the Sound or East River and so round the points of the necks till it comes to Hempstead Harbour," conveyed the land under the water of Manhasset Bay which lies between the point where the line strikes the Sound and Hempstead Harbor.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. ⬅️36.]

2. NAVIGABLE WATERS ⬅️36—LAND UNDER BAY—PATENT.
The New Netherlands patent of 1644 to the town of Hempstead, which granted a certain quantity of land extending from the East River to the South Sea, with all the havens, harbors, rivers, creeks, and other appurtenances, conveyed the land under the water of Manhasset Bay.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. ⬅️36.]

3. FISH ⬅️3—GRANT OF RIGHTS—DUTCH LAW.
Under the Dutch law in force in 1644, a common right in the lands under rivers and harbors, including the right of fishing, could be granted by the government to private individuals.

[Ed. Note.—For other cases, see Fish, Cent. Dig. §§ 3, 4, 6–8; Dec. Dig. ⬅️3.]

4. NAVIGABLE WATERS ⬅️36—OWNERSHIP OF BAY—CONSTRUCTION OF PATENT —EXTRINSIC EVIDENCE.
Since the law permitted a grant of the land under the waters of a bay, and the right to the shellfish in such water was a valuable one, and the patent had always been construed by the town and by the Attorney General to include the land under the water, it will not be presumed that the recorded patent of 1644 from New Netherlands to the town of Hempstead is a translation, and that the grant of the harbors and rivers was erroneously inserted.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. ⬅️36.]

Appeal from Trial Term, Kings County.

Action by Lillius Grace against the Town of North Hempstead to determine a claim to real property. Judgment for defendant upon a directed verdict, and plaintiff appeals. Affirmed.

Argued before JENKS, P. J., and THOMAS, CARR, RICH, and PUTNAM, JJ.

Henry A. Uterhart, of New York City, for appellant.
M. Linn Bruce, of New York City, for respondent.

PUTNAM, J. This is a proceeding to determine the title to the land beneath the waters of Manhasset Bay, formerly called Cow Bay, a narrow harbor on the north shore of Long Island. It lies between Great Neck and Manhasset Neck (formerly Cow Neck), and is entered between Hewlett Point, on Great Neck, and Barker Point, on Manhasset Neck. It is a mile wide at the entrance, and runs in-

land upwards of three miles. The position with reference to the neighboring necks and bays is shown on this diagram:

On the easterly side, Plum Point, extending out to the south, forms a sheltered tidal harbor, sometimes called Plum Harbor, often resorted to by small vessels from the Sound. The bay is also a natural ground for the growth of shellfish. Plaintiff's lands are along the westerly side of Manhasset Bay, about a mile and a half from the Sound. This action involves the title to about seven acres fronting on plaintiff's upland, and out in the bay beyond the mean low-water line.

Plaintiff relies on a state grant by the commissioners of the land office, made June 24, 1912. Defendant, as successor to the original town of Hempstead, from which North Hempstead was set off by Laws 1784, c. 21 (North Hempstead v. Hempstead, 2 Wend. 112), claims to own the waters and bed of this bay by colonial grants, first from the Dutch Governor, William Kieft, in 1644, and later from Col. Dongan, the English colonial governor, in 1685.

Both sides having moved for direction of a verdict, the court granted defendant's motion, and directed a verdict in its favor.

[1] The Dongan patent or charter of April 17, 1685, confirmed to the "patentees and their associates, their heirs, successors and assigns all the privileges and immunities belonging to a town within this government." It thus described the grant:

"Whereas there is a certain town in Queens County called and known by the name of *Hempstead* upon *Long Island,* situate, lying and being on the South side of the *Great Plains* having a certain tract of land thereunto belonging, the bounds whereof begin at a marked tree standing at the head of *Mathew Garret's* bay and so running from thence upon a direct South line due South to the main sea, and from the said tree a direct North line to the sound or east river and so round the points of the necks till it comes to Hempstead Harbour, and so up the harbour to a certain barren sandy beach, and from thence up a direct line till it comes to a marked tree on the east side of *Casstiagge Point,* and from thence a southerly line to the middle of the plains, and from thence a due east line to the utmost extent of the great plains, and from thence upon a straight line to a certain tree marked on a neck called Maskacheung, and from thence upon a due south line to the South sea and the said South sea is to be the south bounds from the east line to the West line, and the Sound or East River to be the northerly bounds as according to several deeds or purchases from the Indian owners and the Patent from the Dutch Governor, William Kieft Relation thereto being had doth more fully and at large appear."

The patent also granted and confirmed unto the patentees—

"all the before recited tract and tracts, parcel and parcels of Land and Islands within the said bounds and Limits, together with all and singular the woods, underwoods, plains, meadows, pastures, quarries, marshes, waters, lakes, causeways, rivers, beaches, fishing, hawking, hunting and fowling, with all liberties, privileges, hereditaments, and appurtenances to the said tract of land and premises belonging or in any wise appertaining."

From this grant was also specially excepted one entire piece of land containing 700 acres, lying and being on Cow Neck.

As both the boundary meridian lines run from the Sound or East River to the Atlantic Ocean, and this bay lies between such meridians, the remaining question is: What is the north boundary of this patent? Here again the import is not doubtful. The Sound or East River means the Long Island Sound, and the course "round the points of the necks till it comes to Hempstead Harbour," plainly means a boundary run around the outer points or headlands of Great Neck and Cow Neck, by which this bay is plainly comprised. All doubt is removed by the final words, "and the Sound or East River to be the northerly bounds." Tiffany v. Town of Oyster Bay, 209 N. Y. 1, 7, 102 N. E. 585. And clearly the patent carried title to the land under water within the bounds of the patent. Roe v. Strong, 107 N. Y. 350, 358, 14 N. E. 294.

[2] Appellant, however, contends that this patent was only to ratify and confirm the patent granted on November 16, 1644, by Governor Kieft, and that this earlier grant did not include, or should not have included, these waters. The learned counsel suggests that this English exhibit, purporting to be a certified copy of the Kieft patent, must be regarded as a mistranslation of an original Latin text, now lost, since other contemporary patents were in Latin. This Kieft patent is certified as recorded from an original, although the New York state records have a volume which professes to record transla-

tions.  George Baxter,[1] whose name as secretary is at the foot, is well known in our colonial history.  He acted as English secretary in dealings with other colonies, and was custodian of charter protocols and records of the Hempstead, Gravesend, and Flushing patents.  The Kieft patent gives the "Patentees, their Associates, heires and successors, full Power and Authority to Erect a Body pollitique or Civill Combination amongst themselves, and to nominate certaine Magistrates," etc., showing an intent to create a town with municipal powers.  It also provides for a town court, in which the magistrates shall sit with civil and criminal powers.  It is said that this Hempstead court was the first town court established in New Netherland.  Laws of New Netherland, preface, p. ix.  The charter grants:

"A certaine quantity of Land, with all the Havens, Harbours, Rivers, Creekes, Woodland, Marshes, and all other Appurtenances thereunto belonging, lying and being upon, and about a certaine place, called the Great Plaines on Long Island, from the East River to the South Sea, and from a certaine Harbour, now commonly called and knowne by Ye name of Hempsteed) Bay, and so westward as farr as Mathew Garritsons Bay, to begin at the head of the said two Bayes, and so to run in direct Lines, that there may bee the same Latitude in breadth on the South side, as on the North."

This instrument was formally recorded in 1666 after the English conquest (see laws of New Netherland, p. 42), and its genuineness and authenticity have never before been questioned.  Its inclusion of these inlets is shown by the comprehensive terms "from the East River to the South Sea."

[3] Counsel, however, queries whether the original Latin text did include harbors, rivers, and other expressions ceding control and rights over waters, on the ground that the Roman-Dutch law recognized such water rights as common to all and not subject to private appropriation.  Thus the power to grant what is clearly given by this colonial charter is for the first time questioned.  A legal theory is urged that by the law and usage of the Netherlands, the parent country, this

---

[1] On December 16, 1642, Baxter had been appointed English secretary to Director Kieft, because, in Kieft's words, "we have great need of a person who can write English and has some experience in law cases." Doc. Col. Hist. of New York [by Fernow], vol. XIV, O. S., p. 41.  After Stuyvesant became director, he made an order on February 10, 1654, that the court messenger demand from Ensign George Baxter copies of the correspondence with New England and Virginia, "also especially the protocols or copies of the patents of the adjacent English colonies of Heemstede, Vlissingen and Gravesend, which the said Baxter has in his deposit." Doc. Col. Hist. vol. XIV, p. 246.  The Flushing (Vlissingen) charter was also in English (Laws of New Netherland, p. 48).  Ensign Baxter, with Lady Moody, had been one of the Gravesend patentees, by charter of December 19, 1645.  This grant to Gravesend was in English throughout, and employed a formula like that in the patent to Hempstead, which was no doubt taken from that in the royal charter to Plymouth council in 1620.  Gould on Waters, vol. 1, § 31, p. 72.  The Gravesend grant was together with "ye havens, harbours, rivers, creeks, woodland, marshes, and all other appurtenances thereunto belonging." O'Callaghan, Doc. History of New York, vol. I, pp. 411, 412.  (The original Gravesend patent is still preserved with the Kings county commissioner of records.) Thompson's History of Long Island (2d Ed.) vol. II, p. 171, says that the Gravesend charter was "both in Dutch and English"; but the minute publication of all records since the date of Thompson's history (1843) seems to negative any original except this in English.

charter was ultra vires, so far as it included harbors and havens. We are asked to find the law which the Dutch accepted and practiced at the critical date of 1644, when the colonial authorities made this grant. Counsel refers us to texts of the Institutes, and of a Dutch commentator, to the effect that the sea, the air, also the sand and shore of the sea, are res communes, "so that according to the law of nations everyone is at liberty to navigate, fish in, and use the same at his pleasure, without however injuring another." Van Leeuwen, Com. on Roman-Dutch Law (1664, Kotze Trans.) vol. 1, p. 150 (London, 1881).

This generalization of the public right to the sea and its shores, and especially general rights to fish, was one of the broadest doctrines of the Roman law. The subject falls under two heads—the right to fish, and whether rivers, harbors, and portions of the sea were then regarded as alienable, and subject to exclusive occupancy.

As to the right to fish, the practice before Justinian of treating it as a jus publicum did not long continue. In the "Introduction to Dutch Jurisprudence," published in 1631, a work which had eight editions before 1644, Grotius says the United States of Holland and West Friesland are proprietors of the rivers, such as the Rhine, the Waal, the Maas, the Ijsel, and the Lek, in so far as they flow within the limits of Holland, also of the lakes and other navigable waters, and of the beds of all such streams and waters, together with the shores or banks of the same covered with water. Here follows an admission that the state, however, did then grant exclusive proprietary rights in its rivers to private individuals:

"The right of fishing in such streams has since times of old belonged to the state, and has been granted to the counts for their maintenance, by whom it has been granted to many vassals and others." Book II, 27 (Eng. Trans. p. 44).

Vinnius, in the Commentary on the Institutes, written from Leyden in 1642, strikingly traces this change from public to private ownership. "The jus piscandi," he says, "in the beginning belonged to the people. Thence it passed to the princes, and now no one may have the right, except by their leave, and within certain laws and limitations." Com. Inst. Imp. lib. II, title 1, § 2 (Ed. 1709, p. 127).

The Flemish and Dutch municipalities or "communes" gradually recovered for their inhabitants some of the oppressive rights and revenues before appropriated by the nobles. Among such sources of municipal income wrested from the perquisites of the lords was the privilege to fish in the canals—a right made common in certain of the stronger towns more than a century before the Dutch West India Company had been formed. Blok, Hist. of the People of the Netherlands, vol. 1, p. 226 (N. Y. 1898). This right to fish was specially secured in the early charters of Amsterdam. Van Leeuwen, vol. 1, p. 164, note.

Proprietary ownership of waters by Dutch law is also plain. Dutch law did not deny that local waters could be occupied, and hence were alienable. Rivers and their beds were thus subject to proprietary rights. So Vinnius shows that the ownership of newly formed islands

in rivers is incident to, and derived from, the ownership of the bed.
Com. lib. 2, title 1, 4.

Grotius, writing in 1625, qualifies such ownership of river beds,
limiting it to rivers relatively small, as compared with the extent of
the bordering lands. De Jure Belli ac Pacis, lib. II, cap. III, § 7.
But he passes on from rivers to bays and estuaries, which he shows
were included in private estates. From these illustrations he reasons
that larger portions of the sea may be so owned, saying:

"Since a portion of the sea may become part of a private estate, namely if
it be included in the estate and is so small as to seem part of it, and since
that is not repugnant to natural law, why should not a portion of the sea in-
cluded within the territory of a people or of several peoples, be the property
of those whose the shores are, provided that the size of that portion of the
sea compared with the territory be not larger than the inlet of the sea, as
compared with the estate." Lib. II, cap. III, § X, 2.

Therefore, under the Roman-Dutch law as recognized and prac-
ticed in the Netherlands at 1644, we find nothing against the grant of
ports and havens in this charter to the newly formed town of Hemp-
stead.

[4] Furthermore, an attraction possessed by Long Island for set-
tlers, and one that drew colonists from New England, was the shell-
fish abounding in its bays and inlets. Naturally such settlers would
seek to have the grants to them include the waters containing such
a source of food supply. Such a grant to found a body politic or
town, as we have seen, would involve no violation of Dutch law and
custom, and would be the only effectual way to protect the natural
shellfish beds from alien depredations. Therefore, on the internal evi-
dence from the wording and form of these patents, and from the ex-
trinsic facts as to the situation of the colony, we would not be justi-
fied in deleting from the scope of this charter this received and settled
formula for the cession of ports, harbors, and inland waters.

The conclusion that these patents embraced the waters of Man-
hasset Bay was also the ground upon which the commissioners of
the land office were advised by Attorney General Tabor in 1890, acting
with the state engineer and surveyor, to deny an application for these
lands under water, by this same appellant, since the Attorney General
there held that the town had made sufficient proof of its title through
these colonial grants. Such an opinion, though administrative, binds
the departments, and is entitled to weight as proceeding from the law
officer of the state. People ex rel. Snyder v. Hylan, 212 N. Y. 236,
240, 106 N. E. 89.

Appellant cites Town of North Hempstead v. Eldridge, 111 App.
Div. 789, 796, 98 N. Y. Supp. 157, 161; but this dealt with lands
under Little Neck Bay, which the learned referee found were out-
side of, and to the westward of, these boundaries. He did not pass
on the northern bounds of these patents, as he stated:

"As to these northern limits no controversy had arisen or seemed likely to
arise."

In 1669, before the Dongan patent, Hempstead at a general town
meeting voted that the north boundary of their patent was the Sound.
Since 1686, the town had taken control over the waters and the shores

of these harbors. It has passed regulations over fishing, as well as touching the building and maintenance of docks, which powers and authority it has continued actively to exercise up to the present time. This long usage constitutes the best exposition of the grant. Trustees of Brookhaven v. Strong, 60 N. Y. 56, 72. Hence it must be held, as in Tiffany v. Oyster Bay, supra, that the state had not title to the property which it assumed to grant to this plaintiff.

I advise, therefore, that the judgment and order be affirmed, with costs. All concur.

(S9 Misc. Rep. 440)