William R. Brehr-ax, Jr., J.
Plaintiffs in these three consolidated actions, tried before me without a jury, seek to enjoin the defendants from constructing an incinerator on a 52-acre parcel of land presently under water in the southwest portion of Hemp-stead Harbor adjacent to Lots 10-A, 10-B, and 11 of Section 6 of Block 53 of the Nassau County Tax Map.
The first action, commenced by a group of taxpayers in the Town of North Hempstead, sets forth five causes of action, the first three of which are brought pursuant to section 51 of the .General Municipal Law alleging, respectively, an illegal official act, waste of public funds in that the town does not own title to the site, and waste of public funds in that the title to the site is at best in doubt. The remaining two causes in the taxpayers ’ action are common-law causes based upon private and public nuisance. The other two actions are brought by two incorporated villages located in the vicinity of the proposed site and are based exclusively on public nuisance, The section 51 causes in the taxpayers’ action will be considered first and the nuisance causes in all three actions thereafter.
*855 At the outset, it might be noted that the Appellate Division has twice considered the pleadings in the taxpayers’ action, the first such appeal resulting in a dismissal of the complaint with leave to replead (Olin v. Town of North Hempstead, 11 A D 2d 797), and the second appeal resulting in a dismissal of 3 of the 8 causes of action asserted in the second amended complaint with a denial of the defendants’ motions under rules 106 and 113 of the Civil Practice Act with respect to the five surviving causes of action enumerated above (Olin v. Town of North Hempstead, 13 A D 2d 996). No prior appeals have been taken in the two actions commenced by the villages, but it might be noted that a motion directed to the sufficiency of one of the complaints on the ground that the village did not have capacity to sue was denied by Special Term and no appeal taken. Thus, the capacity of the villages to sue has been sustained and constitutes the law of the case binding upon this court.
The first question to be determined concerns the legality of the proposed erection of the incinerator on the 52-acre plot.' In this connection the facts admitted by the pleadings are vital. In addition to the necessary technical allegations, the following-facts are admitted. On February 10, 1959, the Town Board adopted resolutions authorizing the construction of an incineration plant and the issuance by the town of serial bonds and capital notes in the total amount of $3,650,000 for the purpose of financing the cost of construction of the plant “on a site situated in Section 6, Block 53, Lot 10-B on the Nassau County Land Map and located on the West Shore of Hempstead Harbor east of the Roslyn West Shore Road.” (Emphasis supplied.) Within 30 days thereafter a proper petition requesting a referendum was filed. On April 18, 1959, a referendum was held on the proposition to issue the bonds and notes. The proposition submitted to the voters insofar as the description of the site is concerned stated, “ona site situated in Section 6, Block 53, Lot 10-B on the Nassau County Land Map and located on the West Shore of Hempstead Harbor east of the Boslyn West Shore Boad.” The proposition was approved by a vote of 21,184 to 12,394. The town has also admitted that it proposes to construct the major portion of the incineration plant and facilities on 52 acres of land under water “ abutting and immediately adjacent to that land identified as Section 6, Block 53, Lot 10-B on the Nassau County Land Map ” (emphasis supplied), and that said 52-acre plot of off-shore land lies wholly outside of Section 6, Block 53, Lot 10-B of the Nassau County Land Map. Thus, the only material allegation contained in the first cause of action *856 asserted in the complaint which is controverted is that which alleges that the proposed construction on the 52 acres of offshore land was not authorized by the resolutions and referendum and that, consequently, such construction would be illegal and would result in waste of the town’s funds.
This cause of action was sustained by the Appellate Division and the denial by that court of the defendants ’ motion for summary judgment places squarely before this trial court the factual questions whether the resolutions did or did not authorize the proposed construction on the 52-acre site, in which latter event the proposed construction would be an illegal act, and whether such an illegal act would result in waste. The primary question to be decided here is whether the resolutions of the Town Board have authorized the construction on the proposed 52-acre site. If these resolutions have not authorized such construction, then the submission of an identical proposition to the voters of the town by referendum cannot serve to broaden the bond resolution or cure any defect therein.
Towns in New York State, unlike the New England towns, were created and organized by statute and all their powers are prescribed by statute. (Holroyd v. Town of Indian Lake, 180 N. Y. 318.) None of their powers is derived from the common law, all being purely statutory. (Brothers v. Town of Leon, 198 App. Div. 144.) The statutes have reposed the general powers of the town, not in its inhabitants, but in their duly elected representatives who constitute the Town Board. (Town Law, § 64.) The legislative power which the State has delegated to towns lies in the Town Board. The inhabitants themselves, except in rare instances where they are given the power of initiative, cannot legislate, but can only, under the limited conditions set forth in the statutes, exercise a veto power over a legislative act of the Town Board in the form of a referendum. (Town Law, § 90; Mills v. Sweeney, 219 N. Y. 213.) Such is the power of the Town Board that if it adopts a resolution which is subject to a referendum, and a petition is thereafter tiled requesting the referendum, it may rescind the resolution and the referendum need never be held. (Town Law, § 93.) A referendum in effect, then, is no more than a veto power vested in the electorate to review an act of the Town Board. It can in no way constitute a direction to the local legislative body to do more than that body has already determined by its own resolution to accomplish. Advisory referendums are not authorized. (Mills v. Sweeney, supra.)
As stated in Corpus Juris Secundum (62 C. J. S., Municipal Corporations, § 458, subd. c, p. 890): “ If an ordinance or by-law *857 passed by the municipal legislative body or proposed by initiative petition is for any reason invalid, the approval or ratification thereof by the electors under initiative or referendum proceedings will not cure the invalidity of the ordinance.”
In order to determine the legality of the proposed construction on the 52-acre site, then, we look not to the referendum but to the resolutions.
The town argues, however, that the factual issue left open by the Appellate Division, i.e., “whether the description afforded sufficient identification of the adjoining land under water” means in effect whether the people who voted on the referendum knew or did not know of the location of the proposed incinerator. This court does not read the Appellate Division’s decision that way, for, as noted above, since the electorate could not enlarge upon the bond resolution adopted by the Town Board, or amend it by their vote, their knowledge or lack of knowledge of the proposed location of the site is immaterial. Their approval was no more than a ratification of the Town Board’s resolution. It was not in any sense a direction to the board to build the incinerator at a place other than that set forth in the resolution. Thus, the pamphlets issued by the town, the newspaper clippings, the minutes of the Town Board meeting and other documents introduced by the town in evidence for the purpose of demonstrating the state of mind of the voting public are irrelevant. This court’s understanding of the question left open by the Appellate Division is simply whether the description contained in the resolutions sufficiently identified the adjoining land under water, and the court finds that it did not.
The description in the resolutions refers to Section 6, Block 53, Lot 10-B. The proposed construction is to take place not on that lot, but on land under water. Lot 10-B comprises only 9.2 acres, whereas the proposed construction site is over 52 acres in addition to those 9.2 acres. The 52-acre plot is not only adjacent to Lot 10-B, but also extends both north and south of its boundaries and is adjacent to all the shoreline of Lot 10-A and all the shoreline of Lot 11. Lot 10-B will only be used as access to the 52-acre parcel, and will constitute no more than the tail of the dog.
The town cannot build an incinerator without adopting a resolution (Town Law, § 221), and cannot finance its construction on a long-term basis without adopting a bond resolution (Local Finance Law, § 35.00, subd. b, par. 1). The resolutions which it adopted do not authorize construction on the 52-acre site and to proceed with the proposal would, unless the proposal were otherwise authorized, constitute an illegal act.
*858 The next question presented is that of the effect, if any, which chapter 509 of the Laws of 1962 has on this otherwise illegal act, Two days before the conclusion of the trial, and long after the Appellate Division’s decision, the Governor signed the bill which became chapter 509 which purports to legalize, validate and authorize certain official acts and proceedings of the Town Board of the Town of North Hempstead in the County of Nassau in relation to the construction of an incinerator plant and the issuance of serial bonds and capital notes to finance the cost thereof. By its terms this law clearly authorizes the construction of the incinerator on the 52-acre site, notwithstanding the misdescription in the resolutions. Plaintiffs, however, attack the constitutionality of the law on the threefold grounds that it discriminates against the residents and voters of the Town of North Hempstead in contravention of section 11 of article I of the New York State Constitution and the 14th Amendment to the Constitution of the United States, that it authorizes an uncompensated taking of property without due process of law, and that it contravenes section 15 of article III of the New York Constitution in that its subject matter is not expressed in its title.
Mindful of the strong presumption in favor of constitutionality (Knapp v. Fasbender, 1 N Y 2d 212) and of the fact that Special Term should not consider the constitutionality of a statute if a determination may be made on other grounds (Thompson v. Wallin, 276 App. Div. 463, affd, 301 N. Y. 476; Kurlander v. Incorporated Vil. of Hempstead, 31 Misc 2d 121), the court has sought to find any ground upon which the decision could rest without the necessity of considering the constitutional arguments. Thus, the special act was viewed in connection with the general statutes in the Town Law and the Local Finance Law for the purpose of determining whether the latter statutes would control. As it will appear below, however, the special act is in conflict with the general statutes insofar as the power of referendum is concerned, and the special act, rather than the general statutes, is therefore controlling. (McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 397; Rogers v. Village of Port Chester, 234 N. Y. 182.) The court has found no other ground upon which the point at issue can be determined, and, therefore, concludes that the constitutional question is squarely presented.
The first, and demonstrably the most important, constitutional challenge is whether the Legislature of the State of Noav York may, without running afoul of the equal protection clauses of the Federal and State Constitutions (the breadth of coverage of each of which is substantially the same [Dorsey v. Sturvesant *859 Town Corp., 299 N. Y. 512, cert, denied 339 U. S. 981]), enact a law affecting only the Town of North Hempstead which deprives the residents of that town of the right to a referendum. In this connection, it must be noted that the effect of the act is to deprive the residents and voters of the Town of North Hempstead of a referendum on the town’s plan for the erection of the incinerator on the 52-acre site. The residents have had their referendum with respect to the other site and insofar as that referendum is concerned this act changes nothing. Chapter 509 of the Laws of 1962 is actually an enabling act authorizing the Town of North Hempstead to construct an incinerator on a different site and broadening the effect of the bond resolution so that it, too, authorizes the financing of the construction on that different site, all without giving to the residents of the town the right to a referendum.
It is interesting to note that while article IX of the New York State Constitution imposes restrictions on the State Legislature with respect to special or local legislation affecting individual counties, individual cities and individual villages of over 5,000 or more population, no such restrictions are placed upon the State Legislature with respect to special or local acts affecting towns. From this standpoint, counties, cities and villages possess home rule; the townships do not. The State Legislature, iminhibited by article IX restrictions, may, then, freely pass special and local acts pertaining to individual towns except insofar as such legislation may contravene the equal protection clauses of the Federal and State Constitutions.
As stated in Myer v. Myer (271 App. Div. 465, 472): “ The essence of the right to equal protection of the laws is that all persons similarly situated be treated alike. (Frost v. Corporation Commission, 278 U. S. 515, 522; Atchison, Topeka &c. Railroad v. Matthews, 174 U. S. 96).”
We hold here that because of the previous referendum indicating the general locale of the proposed incinerator rather than its precise location, the only persons ‘1 similarly situated ’ ’, insofar as the effect of this act is concerned, are the residents of the Town of North Hempstead, and as they are treated alike by chapter 509 of the Laws of 1962, the act cannot be said to deny them equal protection of the laws. Similar local legislation has been frequently upheld. (Knapp v. Fasbender, 1 N Y 2d 212, supra; Town of Irondequoit v. County of Monroe, 158 Misc. 123, affd. 254 App. Div. 933, appeal dismissed 279 N. Y. 658; Robertson v. Zimmermann, 268 N. Y. 52.) While the Robertson case can be distinguished in that it involves an exercise of the police power by the State, and the Irondequoit case may be distin *860 guished by virtue of its de minimis overtones, and the Knapp case may also be distinguished in that the equal protection issue was not squarely presented, yet the cumulative effect of these decisions, upholding, as they do, special local acts of the State Legislature designed to accomplish a single local purpose, together with the presumption of constitutionality attendant upon State legislative enactments, and the lack of appropriate precedents to the contrary, constrains the court to hold that the act does not contravene the equal protection clauses.
The other constitutional arguments are contrived. The act in no way authorizes, nor does it purport to authorize, the uncompensated acquisition of private property. Thus, the due process clause is not offended. Moreover, the title of the act fully expresses its subject matter. The title deceives no one, misleads no one, and is, therefore, in accordance with the requirements of section 15 of article III of the New York State Constitution. (Knapp v. Fasbender, supra; Burke v. Kern, 287 N. Y. 203.) The act is accordingly held constitutional and requires a dismissal of the first cause of action.
With respect to the two causes of action which allege that title to the land under water comprising the 52 acres (1) is in New York State, or (2) is at best in doubt and that to build upon such land would constitute waste, the court dismissed the first cause at the end of the plaintiffs’ case on the ground that plaintiffs had not proved title in the State, and that, in any event, the State, not being a party to this action, no determination by this court that title was not in the State could be binding upon the State. There is left for determination, then, the question of whether title to the land is in doubt, and if it is, would the town be committing waste by building upon it.
The town bases its claim to title of all the lands under water in that portion of Hempstead Harbor south of Bar Beach, which includes the proposed 52-acre site, on the Kieft and Dongan Patents. These and other patents affecting adjacent land on the north shore of Long Island have been interpreted by the courts of this State in a line of decisions. In Roe v. Strong (107 N. Y. 350, 358) the court enunciated the basic rule that these colonial patents vested in the towns legal title to soil under waters of bays and harbors “ within the bounds of the patents ”. While this case dealt with the Nicolls Patent of 1666 and the confirmatory Dongan Patent of 1686 concerning lands granted to the predecessors in interest of the Town of Brookhaven, the principle enunciated applies with equal force to the Kieft and Dongan Patents insofar as they purport to convey to the predecessors of the present Town of North Hempstead.
*861 A series of cases, following the principle laid down in the Roe ease (supra) have interpreted the language of the Kieft, Nicolls, Dongan and Andros Patents with varying results. Thus, the Town of North Hempstead was held not to own the land under water in Little Neck Bay (Town of North Hempstead v. Eldridge, 111 App. Div. 789). The Town of North Hempstead was held to have title to the land under waters in Manhasset Bay (Grace v. Town of North Hempstead,, 166 App. Div. 844). The Town of Oyster Bay was held to have title to the land under water in Cold Spring Harbor (Tiffany v. Town of Oyster Bay, 209 N. Y. 1).
The only cases dealing with land in Hempstead Harbor are People ex rel. Underwood v. Saxton (15 App. Div. 263, affd. 154 N. Y. 748); Town of North Hempstead v. Oelsner (148 App. Div. 779); and Town of North Hempstead v. Stern (86 Misc. 520, affd. 170 App. Div. 920).
In the Saxton case (supra) the court held merely that the Town of Oyster Bay did not own title to the land under water in Hempstead Harbor. It did not in any way determine whether the ownership of that land was in the Town of North Hempstead or in the State of New York. In the Oelsner case the issue did not pertain to land under water but to the title of the town to Bar Beach, and in that case the court affirmed a jury determination to the effect that the Kieft Patent did in fact grant to the predecessors of the Town of North Hempstead the land known as Bar Beach. In the Stern case the court held that the Town of North Hempstead was the fee owner of land under water in Hempstead Harbor below the high-water mark and known as Motts Cove.
It might be noted in passing that in none of the cases concerning the land in or under Hempstead Harbor was the State of New York a party. Thus, there has been no adjudication binding upon the State, which is known to this court, determining that the town has title. And, more important, no adjudication can be made by this court which will bind the State, since it is not a party to the action.
Ordinarily, a party seeking an injunction should not be allowed to indulge in fantasy and invent hypothetical barriers and remote apprehensions of danger to justify the desired relief. Consequently, notwithstanding the fact that the State is not a party to this action, the court would deny the injunction if convinced that the fears were groundless or that the State was unlikely ever to make a claim of title to the underwater land. The fears, however, are not groundless. The language of the ancient Kieft Patent places the northern boundary of the grant as the “ Bast River.” This, it is conceded, means what we now *862 call, 296 years later, the Long Island Sound. But where the harbor ends and the sound begins is nowhere amplified or clarified. As the court noted in Saxton (supra, p. 269): “ The sides of the harbor or bay proceeding toward the sound diverge, and where the sound may be deemed to commence is not made clear.” The Kieft Patent places the eastern boundary of the grant as “a certaine Harbor, now commonly called and knowne by Ye name of Hempstead Bay, * # * to begin at the head of the said * * * Baye[s] ”. Hempstead Bay is now known as Hempstead Harbor, but nowhere is the “ head ” of the harbor more precisely located. Thus, under the language of the Kieft Patent, both the northern and eastern boundaries are left indefinite. The Dongan Patent is less vague, and the town advances a strong argument under its language. This patent, delineating the northeastern boundary of the grant, states: “ till it comes to Hempstead Harbour, and so up the horbour to a certain barren sandy beach, and from thence up a direct line till it comes to a marked tree on the east side of casstiagge point (Emphasis supplied.) The barren sandy beach is undoubtedly what is now known as Bar Beach, and if a “ direct line ” (which the court interprets as meaning a straight line) be drawn from any point on Bar Beach, or even across from Bar Beach on the east shore line, to Casstiagge Point, the 52-acre site would come within the bounds of the patent.
Convincing though this argument may be, it still leaves certain questions open. In most, if not all, of the reported cases on the subject, the courts construed the Dongan (English) Patent together with the appropriate Dutch Patent which preceded it, and it has been frequently assumed in these cases that the Dongan Patent was granted solely for the purpose of ratifying and confirming prior grants in the Dutch Patents. In Grace v. Town of North Hempstead (166 App. Div. 844, supra) an argument was advanced that the Dongan Patent merely ratified and confirmed the Kieft Patent. The court not only recognized the argument, but apparently approved it. Otherwise, having specifically held that the Dongan Patent granted to the Town of North Hempstead the land under water in Manhasset Bay, it would not have considered the question of whether the Kieft Patent also granted title.
Moreover, the State has consistently, from 1836 through 1952 at least, exercised dominion over lands under water in Hemp-stead Harbor. Numerous letters patent have been issued by the State to individuals granting underwater land in the harbor and, remonstrances against these grants having been filed by the town, the Board of Commissioners of the Land Office of the State *863 upheld title in the State and overruled the remonstrances. On May 20, 1952, Attorney-General Nathaniel Goldstein, reporting to the Board of Commissioners of the Land Office, specifically advised that in his opinion title to land under water in Hemp-stead Harbor was in the State, and pointed out that an action had been commenced by the Town of North Hempstead in 1901 against a grantee of the State to land under water in Hempstead Harbor, which never went to judgment and was discontinued.
With this background, and realizing that the State of New York can in no way be bound by any determination in this lawsuit, the court cannot hold that title in the town is clear and free from doubt. To proceed with construction in this confused state would be an obvious potential waste. Molding the decree to the exigencies of the situation, the court is, therefore, constrained to grant a limited injunction prohibiting the construction of the incinerator on the contemplated 52-acre parcel unless either the town obtains a grant of the State's interests, if any, in said parcel, or the town is successful in establishing title as against the State in an appropriate proceeding, or the town obtains an unconditional fee policy of title insurance sufficient in amount to cover the entire cost of the contemplated project. The first of these alternatives may not prove too difficult to satisfy, since, under chapter 508 of the Laws of 1962, approved by the Governor on April 14,1962, the Office of General Services in the Executive Department has been authorized and empowered to grant to the Town of North Hempstead all the right, title and interest of the State in the 52-acre parcel.
This leaves for determination the questions of nuisance. Plaintiffs rest their nuisance causes upon two broad theories, air pollution and water pollution. It is claimed, first, that because of the unique topographical and thermal conditions in and over Hempstead Harbor, the effluent from the incinerator stacks will not be dissipated but will remain in heavy concentration in the immediate atmosphere with attendant deleterious effect upon human health. The harbor itself constitutes a meteorological basin in which and over which there are frequent air inversions. These inversions tend to have a depressant effect upon stack effluent discharged below the inversion layer.
To state these conditions is to pose an engineering problem, but the court is convinced that the problem can be solved. There is no doubt that if a batch-burning incinerator were constructed in the area, with low-stack heights and inadequate air-cleaning equipment, the heavy concentration of noxious gases and particulate matter emitted from the stacks would be trapped, with resultant discomfort to those persons in the vicinity. While *864 the town’s plans have not been completely finalized, it can, nevertheless, be stated that there is no demonstrated intention to construct such a plant on the chosen site. Enough has been shown to demonstrate that stack heights of 265 feet are economically feasible. At such a height the stacks would either penetrate the inversion layer and thus elude the trap, or, if the inversion layer were even higher than the stack height, the effluent would be discharged at a level above the ridge lines on the sides of the harbor, providing a horizontal avenue of escape. This is not to say that there would be no concentration but only that such a stack height would substantially reduce the concentration. It has also been demonstrated that the town intends utilizing the latest air-cleaning devices used in modern incineration and that such devices can all but eliminate particulate matter from the stack effluent. From a contamination standpoint, then, there are left only the noxious gases as potential sources of danger. While the concentration of these gases Avhich exists at the mouth of the stack would, according to the only medical proof in the case, be mildly detrimental to human health, the obvious fact is that upon leaving the stacks these gases will combine with the air and their strength will be dissipated. There is no proof whatsoever that the concentration lex-els of these gases after combining with the air will be in any xvay harmful.
With respect to water pollution, there is simply a failure of proof, for in order to prevail, since the town’s construction plans are not finalized, the plaintiffs would have to prove that no incinerator could be constructed on the site without pollution of the waters in the harbor. The testimony is clear that pollution can be avoided through proper construction process.
The court, therefore, finds that a modern incinerator can be constructed on the site which will not constitute a nuisance. In making this finding, the court is also generally aware of the regulations of the new State Air Pollution Control Board (see Public Health Law, art. 12-A) and assumes that any plant constructed by the toAvn on the chosen site will be in compliance Avith these regulations.
Accordingly, the first, second, sixth and seventh causes in the taxpayers’ action and the complaints in the actions brought by the villages are dismissed and an injunction will be granted against the town to.the limited degree set forth above under the third cause in the taxpayers’ action.