Town of Irondequoit, Plaintiff, *v.* County of Monroe and Others, Defendants.

Supreme Court, Monroe County, August 30, 1935.

*George R. Lunn, Jr., Town Attorney* [*John Van Voorhis* of counsel], for the plaintiff.

*Marvin R. Dye, County Attorney* [*James E. Cuff* of counsel], for the defendants William J. Callister and others, as the board of supervisors of Monroe county, Harry J. Bareham, as county treasurer, and James I. Morrall, as treasurer in succession.

*Hubbell, Taylor, Goodwin, Nixon & Hargrave* [*Clyde O'Brien* of counsel], for the defendant William F. Widman.

*Harris, Beach, Folger, Bacon & Keating* [*Kenneth B. Keating* of counsel], for the defendants Kingston Savings Bank, Eleanor W. Victor, as trustees, etc., and Lincoln-Alliance Bank and Trust Company, as executors, etc., and others similarly situated, intervening.

*Sutherland & Sutherland* [*Arthur E. Sutherland* of counsel], for the defendant Union Trust Company, intervening.

*Kenefick, Cooke, Mitchell, Bass & Letchworth* [*Arthur E. Sutherland* of counsel], for the defendant Marine Trust Company, intervening.

*Clarence M. Platt, Corporation Counsel* [*George B. Draper* of counsel], for the City of Rochester, *amicus curiæ*.

*John J. Bennett, Jr., Attorney-General* [*William H. Tompkins* of counsel], for the State of New York, *amicus curiæ*.

*Edward M. Ogden*, for the Town of Brighton, *amicus curiæ*.

*Webster & Smith* [*Franklin H. Smith* of counsel], for the Towns of Pittsford and Greece, *amicus curiæ*.

*Stephen J. Warren*, for the Towns of Rush and Henrietta, *amicus curiæ*.

*Joseph L. Humphrey*, for the Town of Ogden, *amicus curiæ*.

*Scully & O'Brien*, for the Towns of Hamlin, Wheatland, Parma, Chili and Riga, *amicus curiæ*.

SAWYER, Official Referee. This action is to recover, from defendant Monroe county, the unpaid balances, with interest, of the amounts provided for the town of Irondequoit in the annual tax levies of 1931 and 1932, and for certain other incidental relief necessary to effectuate the demands of the plaintiff.

It appears that in the county tax levy of 1931 there was provided for the plaintiff the sum of $997,781.41, of which $606,639.83 was received by the tax collector and paid to the town supervisor, leaving unpaid $391,141.58, which was, on or about April 11, 1932, together with other taxes included in the tax roll, returned by the collector to the treasurer of defendant county as unpaid.

In the county tax levy of 1932 there was included for the plaintiff $1,031,904.21, of which there was collected and paid to such supervisor by the tax collector $532,700.03, leaving unpaid $499,204.18, which was, together with other taxes included in the tax roll, on or about May 1, 1933, returned by the collector to the treasurer of the defendant county as unpaid.

These unpaid town taxes, except as at the time of the beginning of this action the sum $84,848.86, have since been paid by the county treasurer to the supervisor of the town, under an agreement between the town and county that the same should be considered to be involuntary payments and, in event the instant litigation be determined adversely to the plaintiff, same would be returned to the county, with interest.

The action is based on the decision of the Court of Appeals in *Town of Amherst* v. *County of Erie* (260 N. Y. 361; reported below, 236 App. Div. 58), where it was held that notwithstanding the lack of express statutory authority therefor, the defendant county was bound to make good to the plaintiff town the deficiencies in its tax moneys; that the legislative scheme of taxation in this State can only be construed to mean that while the State is the sole taxing power, it has delegated to the counties the duty of collecting for it all taxes in their territorial limits, such part of same as were levied for the use of the towns in each county to be, for convenience, paid by the tax collector directly to the supervisor thereof (Tax Law, § 59); that, if there be a deficiency in collection of the town's share, the county must make same good.

The Court of Appeals reiterated this holding, in principle, in *Matter of County of Oswego* v. *Foster* (262 N. Y. 439).

The Tax Law establishes a system of tax collection general throughout the State, except that in certain counties special acts alter the method to be locally followed. The counties of Monroe and Erie, and, so far as the collection of taxes in the city of Fulton is concerned, the county of Oswego, which was the plaintiff in the *Foster Case* (*supra*), are among those operating under such special statutes.

At the outset we are met with the contention that any law, legislative or judicial, which attempts to hold the county of Monroe liable for a deficiency in the collection of the taxes levied for the benefit of plaintiff, runs counter to the provisions of article 8, section 10, of the State Constitution, and, likewise, violates the due process clause in both the Federal and State Constitutions. Those constitutional questions were elaborately briefed in both the Appellate Division (236 App. Div. 58) and the Court of Appeals, when the *Amherst Case* (*supra*) was before those tribunals; one of the briefs was written by the attorney for county of Monroe. In both those courts the decision was adverse to the contention. The Appellate Division opinion discussed the question at some length, reaching its conclusion largely upon the authority of *Whaley* v. *County of Monroe* (235 App. Div. 334) and the reasoning in the case of *Village of Kenmore* v. *County of Erie* (252 N. Y. 437). The Court of Appeals affirmed the decision below, expressly stating that the purposes for which the money was sought to be obtained from the county were governmental. (*Town of Amherst* v. *County of Erie, supra*, p. 373.)

The moneys required by the town of Irondequoit, as submitted to the board of supervisors in the years 1931 and 1932, for which the taxes were levied, included among other town expenses con-

siderable sums for the debt service of districts theretofore organized in the town for lights, sewers, sidewalks and similar purposes, as well as for improvements under the General District Law.

The formation of such special and general districts, and the creation for them of debts to be secured by bonds of the town, was fully authorized. (Old Town Law, arts. 11, 11-a, 12, 13 and 14, as amd.; Laws of 1926, chap. 549, as amd. by Laws of 1927, chap. 637.)

All those are for governmental purposes. (*Whaley* v. *County of Monroe, supra; Amherst* v. *County of Erie, supra.*) Their purposes are not only salutary but necessary for the well-being of a thickly populated and rapidly growing township like plaintiff. This is recognized by the statutes which authorize the incurring of debts for their benefit, and provide that same be underwritten by the town which is, in turn, to charge back to each lot parcel in the district the proportionate amount of the required taxes.

No further consideration of this particular question is required. The *Town of Amherst Case* (*supra*) has disposed of it.

The special tax law of the county of Monroe is chapter 107 of the Laws of 1884, as amended by chapters 718 of the Laws of 1893; 234 of the Laws of 1916; 90 of the Laws of 1922; 171 of the Laws of 1931; and, finally, 476 of the Laws of 1933. The special Erie county statute is chapter 135 of the Laws of 1884, as amended by chapters 383 of the Laws of 1909; 539 of the Laws of 1929; 155, 156 and 255 of the Laws of 1931. It should be added that except when otherwise stated all references herein to the Town Law are to that law as in force prior to January 1, 1934.

Defendants take the position that the *Amherst Case* (*supra*) was decided entirely upon the Erie county act (*supra*); that the Monroe county act differs so widely from that enacted for Erie county that the *Amherst* decision is not here a controlling authority.

It is also contended, on the strength of *People ex rel. Thorne* v. *Ulrich* (an Erie county case decided in Special Term, July 12, 1928, but unreported), that the Tax Law cannot " be judicially grafted upon and made a part of " the special Monroe county act (*supra*).

To the extent that complete provision is made in special acts for the collection of taxes in the respective counties, the referee is in accord with that decision, but, under well-understood rules, whenever special acts are silent and their general phraseology does not indicate otherwise, he is of the opinion that recourse must be had to the Tax Law for guidance. (*Moss Estate, Inc.,* v. *Town of Ossining,* 243 App. Div. 633, case arose under new Town Law; revd. on other grounds, 268 N. Y. 114.)

The Erie county act is more comprehensive than that provided for Monroe county, and in certain respects differs materially from

it. Counsel have furnished the referee with parallel column analyses of these two laws and have diligently investigated and briefed the subject, citing many cases bearing, or thought to bear, upon it. Nevertheless, so far as the method of collecting the taxes is concerned, there appears to be little fundamental difference between the two acts, except that in Monroe county many details, covered by the Erie county law, are left to the Tax Law for guidance.

The Erie county act provides that: "After the board of supervisors of the county of Erie shall have perfected the assessment rolls of the several wards and towns of said county, the said board shall cause the rolls of the several wards to be delivered to the treasurer of said county, and the rolls of the several towns to their respective town collectors, on or before the first day of January in each year." (Laws of 1884, chap. 135, § 1.)

It then directs that the treasurer shall collect the taxes extended upon such rolls for the city of Buffalo and the town collectors shall collect the taxes levied against the property in their respective towns; that the town collector shall make his return to the county treasurer to whom is to be paid over all moneys due to him, with " a full, complete and final accounting under oath of all taxes by him so collected, together with a full and correct statement of all unpaid taxes contained in said roll." (Laws of 1884, chap. 135, § 5.)

By a practical construction the town collectors have paid to their supervisors, from the first moneys collected, the amount raised for their respective towns.

It, in terms, places upon the treasurer the duty of collecting all taxes remaining unpaid on the fifteenth day of April in each year, with interest at the rate of twelve per cent per annum to be calculated from the first day of April.

The Monroe county act (*supra*) contains no similar provisions. The Tax Law (§§ 58 and 59) is, therefore, applicable and provides that the board of supervisors of each county shall levy the taxes for the county, including the State tax, and " set down in a separate column in the assessment roll of each tax district therein, opposite to the sums set down as the valuation of real property the sum to be paid as a tax thereon, including the state tax, as fixed by the department of taxation and finance. Such assessment roll shall, when the warrant is annexed thereto, become the tax roll of the tax district; " that there shall be annexed " to the tax-roll a warrant under the seal of the board, signed by the chairman and clerk of the board, commanding the collector of each tax district to whom the same is directed to collect from the several persons named in said tax-roll the several sums mentioned in the last column thereof, opposite their respective names, * * * and further

commanding him to pay over * * * if he be collector of a city or a division thereof, all moneys so collected appearing on said roll to the treasurer of the county, or if he be a collector of a town:

"1. To the supervisor of the town, all the moneys levied therein for the support of highways and bridges, moneys to be expended by overseers of the poor for the support of the poor and moneys to defray any other town expenses or charges.

"2. To the treasurer of the county, the residue of the moneys so to be collected."

Section 84 of the Tax Law directs that the collectors, within the time specified, make return of their proceedings to the county treasurer, turning over to him the moneys collected, which have not been under the warrant paid to the supervisor, and to also turn over to him an account of the unpaid taxes, properly verified, together with the reasons why collection has not been made.

The Erie county act provides that the treasurer shall pay over to the State its share of the taxes. Similar provision for the other counties is found in section 91 of the Tax Law. Both the general law and Erie county act require that, in case of necessity, the county treasurer borrow the money on the credit of the county for the payment of the State tax.

To this point there is no substantial difference between the statutory directions for procedure in the two counties, except that the special Erie county act contemplates that the treasurer of the county shall collect all taxes returned as unpaid; whereas section 1 of the Monroe county act provides that: " It shall be the duty of the county treasurer of Monroe county to collect annually all unpaid taxes upon lands in said county levied for state or county purposes." (Laws of 1884, chap. 107, § 1.)

If there be ambiguity in this section 1, it arises out of the use of the word " purposes." But for that its intent would be clear and certain. The phrases " state or county taxes," " taxes for state and county " and " town and county taxes " have, by long usage, come to have a well-understood and synonymous meaning.

The State tax is that portion of the tax levy to be used for State purposes; the others are for county and town purposes. The latter two are included in the county levy and are together the county tax. No authority to levy and collect taxes is delegated by the State to the towns.

It is argued that by the use of the word " purposes," the Legislature intended to so limit this section that the county treasurer would be deprived of the power to collect in the usual manner all unpaid taxes levied for the use of the several towns in Monroe

county. In other words, that it retained in him the authority to collect such taxes levied for the State and county expenses and abrogated his power to collect unpaid town taxes.

By such construction, taxes, included in the roll for town requirements, must be collected by the collector whose authority ends with the return of his " roll " to the county treasurer, or not at all. In support of this argument it is urged that until within very recent years no instance is known where, in Monroe county, a collector has been unable to obtain sufficient tax money to meet the town expenditures; therefore, there could have been no legislative contemplation that a situation such as confronts this plaintiff ever would or could arise.

This is but another way of saying that the Legislature, in enacting a special tax law for Monroe county, was entirely lacking in foresight. Everybody, including the law-making body, is aware that conditions are constantly changing and in the absence of specific authority to the contrary, the referee is of the opinion that the alleged ambiguity, if it be an ambiguity, must be resolved in favor of the town.

The tax laws, both general and special, are framed to the end that public expenses shall be met in full. It is unthinkable that the Legislature intended to deprive any town or towns in any particular county of the ability to meet its obligations. Giving section 1 of chapter 107 of the Laws of 1884 the construction claimed by defendants for it, would leave plaintiff powerless to meet the expenses and obligations reported by it to the supervisors of the county in the manner provided by statute (Town Law, arts. 11–14; Id. §§ 133, 170; Laws of 1926, chap. 549, as amd.).

The town requirements of plaintiff for 1932 and 1933 were presented to the board of supervisors and by it levied upon the assessed property in the town (Tax Law, § 58). When these proceedings had been had, the authority of the town to raise the money necessary to meet its annual charges was exhausted. No method is provided whereby it may enforce collection of its unpaid taxes. From that point it is dependent upon the county.

True, it may make temporary loans, but in that it is strictly limited. The phraseology of the empowering statutes negatives any right to borrow for its general purposes after it has become evident that the collector has failed to procure, under his warrant, the moneys needed for its purposes. (Old Town Law, §§ 138, 138-a, 139 and 141.)

It has no general power to borrow money for municipal purposes or for town expenses. (*Wells* v. *Town of Salina*, 119 N. Y. 280.)

The only remedy remaining to the town or its officers is to be found in section 299 of the Tax Law, which provides that within one year after the tax has been returned to the county treasurer uncollected, the town supervisor may institute and prosecute to conclusion "proceedings supplementary to execution, as upon a judgment docketed in such county, for the purpose of collecting such tax and fees, with interest thereon from the fifteenth day of February after the levy thereof."

When the delinquent taxpayers are few in number, this might prove an efficacious remedy, but here the supervisor was, in 1932, dealing with a return of unpaid taxes on 7,457 separate parcels of land, and in 1933 with 7,533 such parcels. By this mere recital it becomes evident that an attempt to collect the taxes, totaling many thousands of dollars, in that manner would have brought but little relief for the immediate necessities of plaintiff and would have plunged the town into a vast number of costly and unprofitable lawsuits.

That proceeding is permissive — not mandatory — and the referee believes that plaintiff's supervisor protected the interest of his town; that his failure to institute these proceedings does not bar its recovery in this litigation.

Again it is said that it was the duty of the supervisor, under section 305 of the Tax Law, to have forthwith caused the undertaking of the collector to be prosecuted for the recovery of these unpaid taxes.

The section cited must be read in connection with the two sections immediately preceding (§§ 303 and 304), and relates only to cases where the collector has either neglected or refused " to pay over the moneys collected by him, to any of the persons to whom he is required to pay the same by his warrant, or to account for the same as unpaid." (§ 303.)

There is no claim that the defendant collector failed to pay over to the supervisor of plaintiff town, as required by his warrant, all moneys actually collected, or to account for, as unpaid, all taxes that had not been collected.

Section 305 being thus limited, it, neither in terms nor by implication, includes such losses as are referred to in section 93 of the Tax Law.

"All losses sustained, and all deficiencies in any taxes, or in the payments to be made therefrom, by reason of the default of any collector, shall be chargeable to the town or city of which he is collector. If occasioned by the default of the treasurer of any county in the discharge of his official duties, such losses shall be chargeable to such county."

And directs that any unsatisfied judgment or part thereof, against the treasurer, for such loss or deficiency on account of the State tax shall become a charge against such county and the board of supervisors shall add " all such losses or deficiencies to the next year's taxes of such town, city or county, and levy the same thereon." (§ 93.)

That a collector of taxes may be held liable for losses occasioned by neglect of his official duties, as well as by actual malfeasance, needs no citation of authority. (§§ 303–305, *supra.*)

The word " default," as used in section 93 of the Tax Law, may or may not include losses or deficiencies sustained by neglect of duty or misunderstanding of law. It does, of course, include neglect or refusal to pay over moneys which he has collected or to account for same as unpaid. For such a default the remedy is provided.

For the other class of defaults there seems to be no specific procedure prescribed for recovery of the loss, unless the final direction of section 93, that all such losses or deficiencies shall be added " to the next year's taxes of such town, city or county, and levy the same thereon," is not confined to losses on account of the State tax but applies also to losses by towns.

In this connection, *Matter of Masterman* (118 N. Y. Supp. 322) is of interest. It was there held that a loss occasioned by a town tax collector is to be enforced in the manner provided by the statute notwithstanding its amount had already been reassessed upon the property of the town and the county made whole by the payment of such reassessed deficiency.

The record shows that in each of the years 1932 and 1933 the collector made his return to the county treasurer and fully accounted for all the taxes included in the rolls. These returns were accepted and in due time the properties (described as tax liens), subject to unpaid taxes, were sold in the usual manner by the county treasurer, and mostly bid in by the county, so that, if not redeemed, the county was in position to obtain full ownership, either by foreclosure (Tax Law, art. 7-A), or in the usual manner of the perfecting of titles under tax sales.

The Erie county act (*supra*, as amd. by Laws of 1909, chap. 383, § 15) provides that at any tax sale all lands offered, which are not bid in by outsiders or where the purchaser fails to fulfill his bid, " shall be deemed to have been sold to and purchased by the county of Erie."

Notwithstanding the stress laid upon this feature of the Erie county act, the referee is unable to discern that the use of the words " deemed to have been sold to and purchased by the county "

confer upon that county much, if any, more advantage than is given Monroe county upon similar tax purchases under the statutes applicable to it.

Erie county gets at most but an inchoate ownership (*Town of Amherst* v. *County of Erie, supra*). It must, under further sections of its act, hold the property subject to redemption, the same as must Monroe. Confirmation by treasurer's deeds is in each case required and, generally speaking, the process of perfecting title is the same in both counties. Such differences as exist are minor in character and in no wise affect the principle applicable to both counties; *i. e.*, that tax sales can only be made absolute after opportunity of redemption by any one lawfully entitled to redeem. The delays and uncertainties in obtaining full title are the same in both counties.

Furthermore, article 7-A of the Tax Law, which became effective April 25, 1930, providing for the foreclosure by the owner of any tax sale certificate of his lien derived from the purchase, is applicable to both Erie and Monroe counties, and negatives any legislative intendment that Erie county, notwithstanding the phraseology, above quoted, of its special statute, in fact acquired full ownership at a tax sale. Section 162 of that article specifically provides that the owner of any such certificate, "including the state or a county, shall have a lien on such lands for the amount of the purchase money paid, and all interest, penalties and other charges allowed by law."

In the *Amherst Case* (*supra*), Judge Hubbs, writing for the Court of Appeals (at p. 373), points out, as an indication of the legislative intent, that properties bid in for taxes in Erie county became thereby freed from any interest therein of the towns in which the property is located, the towns being reimbursed therefor by a return from the county of the amount provided for it in the tax roll but uncollected.

Under the Erie county statute, the county is entitled to twelve per cent per annum on the amount of each tax and a five per cent fee in addition, and, therefore, receives a consideration and has a financial interest in addition to the amount of the tax.

This does not differ from the laws applicable to the county of Monroe, other than by variation in the amounts received.

Under section 82 of the Tax Law, the collector must add to his return of unpaid taxes, the sum of five per centum of the amount chargeable to each parcel, and, under section 6 of the Monroe county act and its amendments of 1931 (Chap. 171), and that of 1933 (Chap. 476), provision is made for certain other penalties and charges.

The penalty provided in section 6 of the Monroe county act is for the benefit of the purchaser at the taxpayer's expense; whereas, the additional charges provided for in the two amendments of 1931 and 1933 are, except a limited portion during the two years, directed to be paid into the county treasury.

Where the county is the purchaser at the tax sale, all these percentages, penalties and charges inure to its benefit. As the property is redeemed or is otherwise converted into money, these percentages, penalties and charges belong to the county.

The referee can see no difference in principle between the laws governing the two counties, so far as relates to this particular subject.

Many other alleged distinctions between the Erie county act and the Monroe county act, supplemented where it is silent by the Tax Law, are called to the attention of the referee. All have been carefully examined but do not need discussion. Differences in arrangement, in expression and the like, are many. It is sufficient to say that there is no such radical difference as to limit the application of *Town of Amherst* v. *County of Erie* (*supra*) to that county alone. On the contrary, it is a controlling authority for the proposition that Monroe county, in the absence of sufficient factual defenses, was, when this action was begun, required to reimburse plaintiff for the amount of its uncollected taxes returned by the town collector in the years 1932 and 1933.

Among other affirmative defenses it is alleged that the defendant William F. Widman, as collector, disobeyed certain commands of the statute relating to his duties, and thereby failed to collect the returned taxes, which he might otherwise have done; that in both the years 1932 and 1933 his returns to the county treasurer were false, fraudulent, void and operated to deceive the county treasurer and procure from him credit for the amount of the unpaid taxes returned, to which credit he was not entitled.

These answers further demand that such returns be vacated and set aside and the town of Irondequoit charged with the amount of the taxes found to have been lost by reason of the collector's default, neglect and failure of duty.

Mr. Widman was not originally a defendant but, on receiving the answers, plaintiff served a supplemental summons and complaint bringing him in. That complaint contained no direct allegations against him but referred to those against him contained in the answer, disputed their truth, and then demanded for the town judgment against him " for any and all losses and damages, which it may be established in this action have been suffered by the plaintiff due to the default, negligence and failure of duty on the part of said William F. Widman."

Mr. Widman duly answered denying the facts and asking that the complaint against him be dismissed. None of the other defendants answered this supplemental complaint.

The facts are simple. The tax warrants for both years, as required by section 59 of the Tax Law, authorized the collector to collect such taxes, in case of non-payment, by levy and sale of personal property. Section 71 of the Tax Law provided: " After the expiration of notice period thirty days, as provided in section sixty-nine of this chapter, the collector shall call, at least once, on every person taxed upon such roll whose taxes are unpaid, at his usual place of residence, if he is an actual inhabitant of such tax district, and demand payment of the taxes charged to him on his property. If the owner of a parcel or portion of real property is a resident of the tax district in which such parcel or portion of real property is assessed, and his name is correctly entered on the assessment roll, he shall be personally liable for the tax assessed against such parcel or portion of real property. If any person shall neglect or refuse to pay any tax imposed on him, the collector shall levy upon any personal property in the county belonging to or in the possession of any person who ought to pay the tax, and cause the same to be sold at public auction for the payment of such tax, and the fees and expenses of collection;" etc.

Section 82 of the Tax Law, as in force in 1932 and 1933, required that each collector should, upon the expiration of his warrant, deliver to the county treasurer an account of unpaid taxes on the tax roll annexed to his warrant, " verified by his affidavit, that the sums mentioned therein remain unpaid, and that he has not, upon diligent inquiry, been able to discover any personal property out of which the same could be collected by levy and sale, and upon the verification of the said account by the county treasurer he shall be credited by the county treasurer with the amount of such account."

Notwithstanding the mandatory direction of section 71, defendant Widman did not, after the expiration of the notice period, call upon any person whose taxes remained unpaid and demand such payment, nor did he levy upon any personal property belonging to or in the possession of any person, resident in the district or otherwise, who ought to pay the tax and cause the same to be sold therefor.

He did send to each taxed person, at his address as given upon the tax roll, a written demand for such payment. There he stopped. The testimony establishes that he might have collected some of the unpaid taxes by levy and sale of personal property within his reach. His explanation is that there were so many parcels upon which the taxes were unpaid that it was physically impossible for him to make a personal demand on taxpayers at their usual place of resi-

dence; that for the same reason and the further reason that he did not understand the requirement in question was mandatory, he made no attempt to collect by levy and sale.

Until 1902 (Chap. 171, § 1) taxes were assessed against the owner of the property assessed, special provisions being made for cases of non-residents. In that year, however, this system of taxation was abandoned. That chapter provided (§ 1) that "In all cases the assessment shall be deemed as against the real property itself, and the property itself shall be holden and liable to sale for any tax levied upon it."

This provision was carried intact by the Consolidated Laws of 1909 into the Tax Law and still remains (§ 9).

Chapter 315 of the Laws of 1911, section 63, strengthened this with the following language: "An error in the description of a parcel or portion of real property shall not invalidate the assessment against such parcel or portion, if such description is sufficiently accurate to identify the parcel or portion. The entry of the name of the owner, last known owner or reputed owner of a separate parcel or portion of real property shall not be regarded as part of such assessment, but merely as an aid to identify such parcel upon the roll.

"If the owner of such parcel or portion is a resident of the tax district in which such parcel or portion is assessed, and his name is correctly entered on the roll, he shall be personally liable for the tax assessed against such parcel or portion of real property."

Chapter 323 of the Laws of 1916 amended the 1911 act so as to make the first paragraph of the just quoted provision a separate section known as section 55-a of the Tax Law, while the direction for personal liability, levy and sale, etc., became and still is a part of section 71.

The effect of these changes was to, thereafter, make the assessment one against the land itself, thereby obviating loss to the public because of mistakes of assessors in entering the names of those against whom the assessment was supposed to be made. (*Smith* v. *Russell*, 172 App. Div. 793; *Witherhead* v. *Ort*, 223 id. 626, 628.)

The recovery of unpaid taxes by distraint and sale of personal property is an ancient and commonly used method. (*Page Belting Co.* v. *Joseph*, 131 Misc. 373, 374.)

The theory was that the tax was against the person and his personal property was accordingly liable therefor. In the beginning no right of sale of the real property for taxes existed although that remedy was later added.

When assessments against the individual were abandoned and the real property itself assessed, the retention of the oldtime remedy

of levy and sale of personalty was, of course, logically inconsistent with the theory underlying the new system. Much wealth of authority has been submitted to the referee to sustain the proposition that by such change the Legislature impliedly repealed the power to collect unpaid taxes by levy and sale of personal property.

Interesting as is the history of this remedy, as gleaned from the cases cited, the undeniable fact is that the Legislature not only failed to repeal, directly or otherwise, the ancient method, but, by chapter 908 of the Laws of 1896, section 71, specifically re-enacted it; again included it in the consolidation of the Tax Law (Laws of 1909, chap. 62), where it not only remains but is fortified by the personal liability enactments of 1911 and 1916 (*supra*).

That it was the duty of the tax collector to comply with the statutory mandate is beyond question. (*Wise* v. *Wedlake,* 217 App. Div. 210, 212.)

The referee's conclusion as to the intent of the Legislature in this respect is substantiated by chapter 610 of the Laws of 1934, by which section 71 of the Tax Law is so amended that, thereafter, the collector may make a personal demand of the taxpayer and may levy on and sell personal property for taxes, " shall " in each instance being eliminated and the word " may " substituted in lieu thereof.

It will be observed that by this amendment the personal liability of the taxpayer and the authority of the collector to levy and sell personal property are still retained, the modification being as to the duty of the collector in connection therewith. If the Legislature did not deem the law as it had theretofore existed mandatory, why the amendment?

In April, 1932, defendant Widman returned the tax roll for the year 1931, with his account of unpaid taxes, to the treasurer of Monroe county, and shortly after the first of May, 1933, the tax roll, with his account of unpaid taxes for 1932, was likewise returned by him.

Both of these returns were verified by the defendant collector, which verification contained the following statement: " That he has called at least once on every person residing in the said town and named in the foregoing account and demanded payment of the taxes charged to such person on the property thereof; and that he has made diligent inquiry and has not been able to discover any personal property out of which the amount of such taxes could be collected by levy and sale as provided in section 71 of the Tax Law."

The second paragraph of this verification was required by the Tax Law (§ 71); the first paragraph was not. It is said to have been contained in the printed blanks furnished by the State Tax

Commission for the making of such tax returns, as authorized by section 171 of the Tax Law.

Neither statement is now required to be contained in the verification. (Tax Law, § 82, as amd. by Laws of 1934, chap. 610, § 2.)

The returns were checked with the collector by the county treasurer's office and all discrepancies reconciled. For the 1931 roll a written certificate of settlement was delivered to the collector. For the 1932 roll no such certificate was issued.

So far as this litigation is concerned, the issuance or otherwise of the certificate is unimportant. Its primary purpose is to enable the collector or his sureties to procure a record entry satisfying and discharging the bond or undertaking. The liability for a failure of the collector to pay over moneys collected still remains. (Tax Law, § 88.)

As to losses occasioned by other failure of duty, the certificate would be at best presumptive only, and in a direct action to recover the loss, open to attack.

Following settlement of the 1931 roll and beginning on August 20, 1932, the real estate (" tax liens "), subject to unpaid taxes so returned, was duly sold therefor by the Monroe county treasurer, the greater number of the parcels being bid in by the county.

Beginning with August 21, 1933, the properties (" tax liens "), against which unpaid taxes on the 1932 roll were returned, were sold also therefor by the treasurer of Monroe county, with like result.

When this action was tried most of these properties, bid in by the county, remained unredeemed and the referee assumes the same situation continues.

In seeking to vacate these returns and accountings, defendants act upon the assumption that Mr. Widman was a town officer for whose failure of duty the town was responsible.

" Town tax collectors are not town officers but independent public officers. (*Lorillard* v. *Town of Monroe*, 11 N. Y. 392.) They act directly for the county under a warrant issued by the county which directs what they shall do and constitutes their authority for acting. After they have acted under such warrants, they are commanded to make a return to the authority which issued the warrants." (*Town of Amherst* v. *County of Erie, supra*, p. 370.)

The court is asked by the county and its officers to hold that plaintiff's cause of action, if otherwise good, must be defeated because of wrongdoing by a public officer over whom it had no control but all of whose official actions were in behalf of the county and under its direction. That is but another way of saying that

it seeks to hold a third party (plaintiff) responsible for the guilt of its own agent, in which the third party had no part.

The county has accepted the collector's returns and acted on them. As far as the plaintiff town is concerned, it may, in this action, stand upon that action.

It is true that ultimately the losses occasioned by the nonfeasance default of a collector must eventually be borne by his town (Tax Law, § 93) but, as has been already indicated, the reimbursement of a county therefor is by way of charging same back to the town in the succeeding year's tax roll.

Possibly a common-law action in behalf of the county to recover same will lie against the collector and his bondsmen, one or all. The bondsmen are not parties to this action and no demand for recovery against the defendant Widman is made by any of his codefendants.

The complaint against defendant Widman expressly negatived any cause of action against him. It goes no further than to refer in detail to the allegations of the answers interposed by the other defendants as to his alleged omissions of duty and fraudulent acts for which it seeks to hold the plaintiff town responsible, and then adds:

" *Third.* That the plaintiff the Town of Irondequoit disputes and takes issue with the correctness of the said allegations contained in the said answers, but further alleges that in event that the defendants are successful in establishing that any of said unpaid taxes have been lost due to the default, negligence or failure of duty of the defendant William F. Widman as tax collector, and in establishing that the plaintiff Town of Irondequoit is chargeable therewith, then the defendant William F. Widman is obligated to pay to the plaintiff the amount of all losses and damages which it may have suffered by reason thereof."

This is followed by a demand for " judgment against the defendant William F. Widman for any and all losses and damages which it may be established in this action have been suffered by the plaintiff due to the default, negligence or failure of duty upon the part of the said defendant William F. Widman."

In view of the conclusion that his codefendants cannot sustain, as against the town in this action, its defense based on the alleged loss caused by Mr. Widman, it follows that the demand to set aside and void the 1932 and 1933 settlements between the county treasurer and defendant Widman must be denied and that plaintiff cannot recover against him in this action.

The answers of the defendants, other than the defendant Widman, also set up the affirmative defense that such portions of the taxes

levied in 1931 and 1932 as represented money needed for the payment of principal or interest, or both, on outstanding bonds of the plaintiff town, were improperly included in the town supervisor's certificate presented to the board; that the moneys were not for lawful purposes of the town of Irondequoit but intended for the payment of void, fraudulent and invalid bonds issued by plaintiff.

Defendants' bill of particulars specifies that all the bonds for which the moneys were levied are invalid because the borrowing of the moneys and the issuance of the bonds was not authorized by the board of supervisors, as required by subdivision 6 of section 12 of the County Law.

It further specifies those issued for the so-called Seneca Side Sidewalk District were invalid for the reason that the money was borrowed and the bonds issued for a purpose other than that of building sidewalks.

No denial of the validity of any of these bonds has been made by the town; on the contrary, payments due thereon — principal and interest — have been regularly met by it.

The soundness of these obligations is a matter between the plaintiff town and their holders. If the full amount presented by the town to the board of supervisors, and by it levied upon the town, had been collected, neither the county nor its officers would have the right to attack them. This situation is not altered when the county is called upon to pay over to the town a deficiency in such collections. Its rights are derived from the town and it can only contest that which the town contests.

The town authorities are required to certify to the board of supervisors an itemized statement of the needs for the ensuing fiscal year. Section 133 of the Old Town Law provided in part: " The board of supervisors shall cause to be levied and raised upon the town the amount specified in the certificate, in the same manner as they are directed to levy and raise other town charges." (See, also, Tax Law, § 78.)

" Other town charges " include all debt services. (Old Town Law, arts. 8, 11, 11-a, 12, 13, 14, and Laws of 1926, chap. 549, as amd. by Laws of 1927, chap. 637.)

The board of supervisors may make certain corrections in the assessments (Tax Law, §§ 54, 56, 56-a and 57), and equalize as between the tax districts the aggregate valuations. (Id. §§ 50, 51, 52, 53.) There its authority to interfere ends.

The referee finds in the statute no power conferred on the supervisors to review the monetary needs of a town as same have been determined by its authorities and properly certified for inclusion in the tax roll. As was said by Mr. Justice FOLLETT: " The juris-

diction of boards of supervisors to make assessments and levy taxes is derived solely from the statutes. Generally, they are confined to the correction of assessments made by the assessors of each town or ward, and are without power to add property to the roll and make assessments thereon except in certain cases pointed out by the statutes." (*Marsh* v. *Bowen*, 12 Abb. N. C. 1.)

The duty of the board of supervisors in levying the taxes for the towns is purely ministerial. The imposition of this ministerial duty should not be enlarged by construction. (*Osterhoudt* v. *Rigney*, 98 N. Y. 222–230.)

When there is presented to it by the supervisor a certificate, in due form of law, as to the amount of the moneys necessary to be raised for the town, the supervisors have no discretion but to direct the amount specified in the certificate to be levied upon the town. (*People ex rel. Onderdonk* v. *Supervisors of Queens County*, 1 Hill, 195–199. See, also, *Matter of Hermance*, 71 N. Y. 481.)

Notwithstanding the referee's determination that the defendant county and its officers, including the treasurer, may not in an action of this character assail the validity of town obligations recognized by the town as enforcible, it is due to all concerned, particularly the holders of the outstanding bonds, that the merits of this particular defense have some consideration.

The burden of proof is upon the defendants county of Monroe, its board of supervisors and treasurer, to establish any irregularity or violation of the statute in the proceedings leading to the issuance of such obligations. (*People ex rel. Melenbacker* v. *Hubbell*, 82 Misc. 624.)

In the absence of such proof, they must be presumed to have been issued in accordance with law, and valid.

" The general rule is that the official acts of public officials are presumed to be valid and binding, and that such officials acted within and pursuant to the authority and powers conferred by law upon them." (*People ex rel. Melenbacker* v. *Hubbell, supra; Hand* v. *Supervisors of Columbia Co.*, 31 Hun, 531; *City of Buffalo* v. *Balcom*, 134 N. Y. 532; *Ramsay* v. *Hayes*, 187 id. 367–370.)

At the trial no testimony was offered concerning any of the numerous bond issues of the town of Irondequoit, except

(a) One dated December 18, 1929, in the aggregate amount of $869,553.79, hereafter called Laurelton bonds.

(b) Another, known as St. Paul street sewer extension bonds, dated July 15, 1930, totaling $18,000.

(c) Still another dated June 20, 1932, in the aggregate sum of $8,900, known as the Empire boulevard bonds.

(d) The issue dated September 7, 1928, amounting in all to $78,602.05, described as Seneca side sidewalk bonds.

As to all Irondequoit bond issues not above specifically mentioned, the demand of the defendants that same be adjudged to be invalid, null and void is dismissed for lack of proof.

The Laurelton bonds (a) were floated for the improvement of Culver parkway, Hurstbourne road, Laurelton road, Marcellus avenue and Whitby road in plaintiff town. Those improvements were made under the authority of chapter 549 of the Laws of 1926, as amended by chapter 637 of the Laws of 1927, commonly spoken of as the General District Law, which is supplementary to but not a part of the Town Law nor of the County or Tax Laws. By its terms the town board of any town may, by compliance with its provisions, make such improvements of the town streets as may be deemed desirable.

Sections 7 and 10 thereof provide that the town board may borrow, by installments or otherwise, upon the credit of the town, a sum equal to the approximate expense of the proposed improvements for the payment of their cost, issuing therefor temporary certificates; that when the total cost has been ascertained and the proper assessments therefor made against the adjoining properties and the roll filed with the town clerk, " the town board shall direct the issue and sale of bonds, pledging the credit of the town, for the aggregate amount of the assessments then remaining unpaid." ( § 10. )

This statute is complete in and of itself and sets up a system for the construction of and payment by a town for such improvements.

Section 10 is mandatory. Its statement is that the " town board shall direct the issue and sale of bonds." It supersedes, and by implication repeals, any requirement that the town procure from the board of supervisors authority to borrow the necessary money and issue its obligations therefor. Under it the town is entirely independent of county control.

So far as appears, there was no defect or irregularity in the proceedings which led to the issue and sale of this series of bonds. It does, however, appear that the improvement of four of the streets in question continued for about 150 feet beyond the western line of the town of Irondequoit into territory of the adjoining city of Rochester, so as to connect same with an improved street in that city.

The resolutions of the town board authorizing the issue and sale of the bonds were adopted December 10, 13 and 18, 1929, and provide that some should bear interest at the rate of five and one-half per cent. The intervening defendants, Union Trust Company of Rochester and Marine Trust Company of Buffalo, submitted a joint bid for the entire issue at that rate of interest. This was accepted by the town board December 18, 1929, and the following

day the town received from the Union Trust Company of Rochester the full amount of this bid, exchanging therefor an interim certificate for the bonds.

Between the issuance of the interim certificate and the definitive bonds, a question had apparently arisen whether the extension of the improvements into territory of the city of Rochester interfered with the validity of the securities, and the Legislature, by chapter 72 of the Laws of 1930, effective March 10, 1930, in very definite and precise language legalized and validated them, " notwithstanding any defect, irregularity or omissions in said acts and proceedings [of the town board] and notwithstanding any lack of statutory authority therefor and said town board is authorized to issue said bonds pursuant to such acts and resolutions, and said bonds shall when issued be valid and binding obligations of said town."

This act was by its terms not effective " unless the purchasers to whom said bonds have been sold shall * * * exchange the interim certificate representing said bonds heretofore issued to said purchasers for bonds bearing interest at the rate of five per centum per annum, payable semi-annually, such exchange to be made within thirty days."

The holders of the interim certificate, within the thirty days, accepted the reduction of interest from five and one-half to five per centum per annum, and the bonds were duly issued to them on April 7, 1930.

Except as limited by the State and Federal Constitutions, the power of the Legislature over its municipal subdivisions is absolute. Subject to that limitation, it may legalize invalid acts of public officers and in all cases where it might have refrained from imposing legal restrictions upon the actions of its officers, it may, at will, remove such restrictions.

" What it could have dispensed with lawfully in the beginning, it may dispense with lawfully in the end." (*People ex rel. Dady* v. *Prendergast,* 144 App. Div. 308, 313; modified as to form of the order and, as modified, affirmed, 203 N. Y. 1; *Rogers* v. *Stephens,* 86 id. 623; *Wrought Iron Bridge Co.* v. *Town of Attica,* 119 id. 204; *Matter of Pardee* v. *Rayfield,* 192 App. Div. 5, 13; affd., 230 N. Y. 543.)

Prior to December, 1928, an action had been begun by the People of the State of New York, under article 76 of the Civil Practice Act, in the interest of the plaintiff town and its taxpayers against certain contractors and engineers, to recover moneys claimed to have been obtained without right from various public districts, boards and officers of the town. This action was ultimately settled by the defendants paying, on December 19, 1929, $600,000, which, under

an order of the court, was deposited with the Comptroller of the State, the order reciting that the moneys so recovered "lawfully belong to said Town of Irondequoit and/or to the public districts, boards and officers of or in said town as hereinbefore mentioned, or should be applied to the objects and purposes for which said moneys were authorized to be raised or procured."

The money paid upon such settlement was intended to indemnify the town as a debtor for any excess in the cost of such improvements due to the alleged extravagance or fraud.

Of this money over $570,000 was, by a court order, paid by the State Comptroller to the supervisor of plaintiff, who in turn allocated same for the benefit of outstanding town obligations specified in the order.

The order, among other things, provides: " And it appearing that the cost of constructing those portions of Marcellus Avenue, Laurelton Road, Hurstbourne Road and Culver Parkway and of all work connected therewith the cost of which is included in the assessments made by the town board situated within the City of Rochester is hereby fully returned to the respective funds pertaining to said last mentioned street improvements, with the result that reimbursement is made for the benefit of the taxpayers upon said streets for the expense of such construction outside of the Town of Irondequoit, and that these and all other taxpayers in said town are hereby to be compensated as justice requires for all matters alleged in the complaint under the distribution hereby ratified and approved."

The town supervisor testified without contradiction that he returned to the account of these particular bonds the cost of such improvements extended outside the town of Irondequoit, so that the town has been fully reimbursed therefor and the proportionate amount thereof will not fall upon the taxpayers for payment.

This payment and allocation had been made when the Legislature, in March, 1930, passed the validating act (Laws of 1930, chap. 72). It is a fair assumption that such act was passed in the light of information, concerning these matters, in its possession.

That no question might later arise to disturb either the bondholders or the property owners, the legislative power to confirm their validity was, in the interest of justice to all concerned, exercised and the bonds placed in the same legal position as they would have been but for the extension of the improvements of these streets.

It can be argued with much force, although not now necessary to determine, that without either the return of the cost of such extensions to the town of Irondequoit or the passage of the validating act (*supra*), the validity of the Laurelton bond issue could not have been successfully attacked.

Without such extension there would have been between the end of certain of the streets and the improved street in the city of Rochester a short stretch of rough and unimproved road. That it was for the public convenience to make those connecting links cannot be gainsaid. They were a necessary part of the Laurelton improvements and needful for their use; were actually for the town purpose and the common and general benefit of its citizens.

Such expenditures have always been regarded as within the power of a municipal government, " and so, too, highways and streets leading into a city or village may be improved, provided the improvements be confined within such limits that they may be regarded as for the common benefit and enjoyment of all the citizens. * * * It could be no worse for a city to incur debt for a city purpose outside of the city limits than for one within such limits, and there is just as much reason for allowing it to be incurred in the one case as in the other." (*People ex rel. Murphy* v. *Kelly*, 76 N. Y. 475, 488.)

In the same case it is held that an act permitting a city to purchase bonds of a private corporation engaged in an extraterritorial enterprise designed for the benefit of a city as well as one adjoining, is not in conflict with article 8 of section 10 of the State Constitution. (*People ex rel. Murphy* v. *Kelly, supra.*)

That case involved the construction of the Brooklyn Bridge, but the principle enunciated is identical with that here presented. The only difference between that case and this is that the one was an enterprise of magnitude whereas this is minor and inconsequential so far as character of the work and its cost is concerned. They differ only in degree. (*Horton* v. *Andrus*, 191 N. Y. 231, 237.)

The conclusion of the referee is that the Laurelton bonds were, and those now outstanding are, a valid and subsisting indebtedness of the town of Irondequoit.

The $18,000 bond issue for the St. Paul street sewer extension (b) is also impregnable. The proceeding which led to the bond issue was taken and carried to completion under article 11 of the old Town Law. At the sale the defendant Union Trust Company was the successful bidder for these bonds. It later developed that there were certain informalities in the petition by which the proceeding was instituted and the successful bidder, probably under advice of counsel, refused to take and pay for them. Thereupon the town brought action against it, the complaint alleging the validity of the bonds. An answer denying same was interposed and the issue was tried before the Hon. Nathaniel Foote as an official referee of the Supreme Court. He found that the proceedings were regular

and that the bonds when " duly issued and delivered to the defendant and paid for by it will be and become regular valid obligations of the town of Irondequoit."

Judgment was entered in accordance with that decision and, so far as appears, both parties acquiesced therein without appeal. The bonds were thereafter issued to the bidder and paid for, so that as between the town and the bondholders, the judgment is *res adjudicata*.

Those of the series that remain unpaid accordingly represent a valid and subsisting indebtedness of the town — one that cannot be successfully defended against by it. It follows that these defendants are likewise bound by such decision.

It may be added that this indebtedness also was reduced by the allocation to it of its proportionate part of the $570,000 already discussed.

The Empire boulevard improvement bonds (c), amounting when issued to $8,900, were likewise purchased by the defendant Union Trust Company of Rochester. This boulevard is a part of State Highway No. 3.

It appears from the record of the proceedings that the State Superintendent of Highways had determined upon its improvement by the construction of a forty-foot reinforced concrete curb and pavement and that the adjoining property owners desired that the boulevard be also improved by the construction of " sanitary and storm water sewer laterals, water service pipes, gas service pipes, electrical service conduits and any other necessary underground work between the curbs."

The proceeding was taken under the provisions of section 4 of chapter 549 of the Laws of 1926, as amended by chapter 637 of the Laws of 1927. No difficulty or failure of compliance with the necessary statutory proceeding has been pointed out and from the record of the proceedings of the town board in relation thereto, which has been examined by the referee, there would appear to have been none. As in other instances, no compliance with the provisions of subdivision 6 of section 12 of the County Law was had or attempted. None was necessary.

The statute itself provides for the payment in the first instance of such improvements by temporary borrowing upon the credit of the town (Laws of 1926, chap. 549, § 7) and then provides that after the total cost has been determined and apportioned and assessed upon the property fronting or abutting the improved portion of the street, and certain other proceedings have been had, " the town board shall direct the issue and sale of bonds, pledging the credit of the town, for the aggregate amount of the assessments then remaining unpaid."

No action by the board of supervisors is called for. Its consent would have been a useless formality. As above stated, the statute is complete in and of itself. Subdivision 6 of section 12 of the Town Law is, by its language, permissive only but if it be construed to mean that towns must obtain such consent before contracting a bonded indebtedness, subsequent legislative enactments, inconsistent therewith, operate for its repeal as to certain classes of bonds (*supra*).

These bonds, like those above spoken of, are valid and enforcible against the plaintiff town. Like the others their outstanding total has been reduced for the town's benefit by the allocation toward their payment of their proportion of the $570,000 recovered through the action of the Attorney-General.

The Seneca side sidewalk bonds (d), dated September 7, 1926, aggregating at date of issue $78,602.05, unlike the others discussed, are vigorously assailed by defendants.

The proceedings for their issuance purports to have been taken under the provisions of article 11-a of the Old Town Law (§§ 250–256), which contains the mandate: "After the expiration of thirty days from the time said assessment is finally made and assessed, the town board shall direct or issue a sale of bonds, pledging the credit of the town wherein said district is located for the aggregate amount of the assessments remaining unpaid." (§ 253, *supra*.)

According to the evidential record of the proceedings, all formal requirements of the statute were complied with.

The point of defendants' contention is that article 11-a of the Town Law only contemplates the formation of a sidewalk district and the subsequent building by it of the sidewalks and incidental improvements desired.

Section 251 of the Town Law says: "The town board of any town in which a sidewalk district is laid out as aforesaid may cause a sidewalk on any street or part thereof in said sidewalk district to be graded and a sidewalk to be built, curbed or guttered, or any one or more of such acts performed," while section 252 empowers "The town board of any town wherein a sidewalk district is laid out and defined as aforesaid * * * after it has favorably acted upon a petition presented by the property owners on a street or portion thereof, as aforesaid, to cause a survey to be made, grade to be established, plans and specifications to be drawn and to advertise for bids to grade and build a sidewalk, lay a curb or gutter on the street or portion thereof described in said petition, or do any one or more of said acts and award a contract therefor to the lowest bidder."

Then follows the provision partly above quoted (§ 253), that upon the completion of these preliminaries and the determination and assessment of the cost thereof shall have been finally completed, the town board shall, after notice to all persons objecting thereto, direct or issue a sale of the bonds necessary to finance the undertaking.

The uncontradicted testimony is that the sidewalks, payment for the cost of which these bonds were issued, were laid and fully completed at least a year before the petition for the formation of a sidewalk district was filed and the following statutory proceeding instituted.

Interested parties had already built the walks on their own initiative and at their own expense. The testimony as a whole indicates that the proceeds from the sale of the bonds in question were used to reimburse those who had built the walks for their cost.

It is argued that this constitutes but an irregularity and that the bonds are made immune from successful defense by section 253 of the Town Law, as amended by chapter 712 of the Laws of 1926, which provides that "All bonds and certificates issued under this section shall be a charge upon the town and the validity of such bonds shall not be dependent on or affected by the validity or legality of the proceedings taken thereunder for the establishment of any such district or for the construction of sidewalks therein, unless the validity of such bonds be questioned in a suit, action or proceeding commenced prior to the issuance of the bonds. No other law shall limit or affect the powers or duties with respect to the issuance of such bonds hereby conferred or imposed upon the town board."

The last sentence disposes of the claim that such bonds require consent of the board of supervisors for their issue.

The proportionate amount of the $570,000 paid to the town for the adjustment of any losses suffered by it from its bond issues has been duly allocated to this issue, so that, presumptively, the town has obtained the sidewalks in this district at their actual value.

Defendants' claim concerning these, as well as the other Irondequoit bonds, cannot be sustained if they are collectible in a direct action between their holders and the plaintiff town. The town has not and does not deny liability for them.

After much consideration the referee has concluded that it is unwise to here anticipate any possible outcome of a direct action to test their validity should one be at any time brought. The Legislature has effectually disposed of any right defendants might otherwise have had to exclude the amounts applicable to them, as well as all others of plaintiff's outstanding bonds, included in the tax levy,

from its reimbursement to the town for the deficit in the tax collection.

Chapter 833 of the Laws of 1933, which became effective October 19, 1933, directs (§ 1) that " The treasurer of the county of Monroe shall, except as otherwise provided in this act, pay over and advance to the supervisor of any town in such county the difference between the amount collected by the collector of town taxes, as shown by the return by him, and the amount levied in said town for the purposes of such town, within thirty days after demand in writing by such supervisor of such treasurer for such payments or advances. * * * For the purpose of this act town purposes shall mean all sums directed by the tax warrant to be paid to the supervisor of the town."

By sections 2 and 3 of the same act its provisions are made retroactively applicable to the deficiencies shown by the tax returns for 1932 and 1933.

Moneys to be used for the purposes of the Seneca side sidewalk bonds were certified by the town authorities to the board of supervisors and by it levied and included in the tax rolls for the plaintiff town for 1931 and 1932. The returns of these rolls to the treasurer having each shown a deficiency in the collection and evidence having been made of a timely service in writing of a demand therefor by the supervisor of the plaintiff town on the county treasurer, there seems to be no escape from the conclusion that, under the mandatory provisions of the act in question, defendants are foreclosed and the treasurer is bound to pay to the town the full deficiency for both years on compliance, by the town, with certain requirements stipulated in said act.

For this reason the claim of defendants in reference to this bond issue is decided adversely to them.

Chapter 833 of the Laws of 1933 was evidently devised and procured to be enacted into law for the purpose of relieving Monroe county from the effect of the decision of the Court of Appeals in the case of *Town of Amherst* v. *County of Erie* (*supra*). It erects a different system from that theretofore prevailing in Erie and other counties. Under it Monroe county is still required to assist its towns in financing a burden of taxation which some probably cannot presently meet. It at the same time provides that the towns must in the end repay to the county all moneys (or practically all) advanced to them for that purpose.

Section 2 of that act is entitled, " Liability of towns for advances," and contains three paragraphs described as (a), (b) and (c).

(a) Applies to taxes levied after the act takes effect, and with it we have no concern.

(b) Provides that " When such treasurer shall [after the act takes effect — words in brackets mine] pay or advance pursuant to this act any deficiency arising from taxes levied in the year nineteen hundred thirty-two payable in the year nineteen hundred thirty-three any such town shall on or before March thirty-first, nineteen hundred thirty-four, repay any such sum so advanced, with interest to date of repayment."

(c) Provides that " If such treasurer shall have advanced prior to the taking effect of this act any sum on account of any such deficiency arising from taxes levied in the year nineteen hundred thirty-two, such town shall on or before March thirty-first, nineteen hundred thirty-four, repay any such sum advanced with interest to date of repayment."

Section 3, entitled, " Advances on taxes previously levied and liability of town therefor," prov des that " The town deficiency upon any tax roll or town tax rolls levied by the board of supervisors prior to the year nineteen hundred thirty-two, which has or have been returned to the treasurer, together with interest up to June first, nineteen hundred thirty-three, upon moneys borrowed by such towns upon certificates of indebtedness in anticipation of the collection of such taxes, * * * shall be paid by such treasurer to the supervisor of such town within thirty days after the written demand of the supervisor, provided, however, that such demand shall if made be made within thirty days after this act takes effect. The board of supervisors shall provide the moneys necessary therefor pursuant to the provisions of this act. The town board of such town shall authorize and deliver to the treasurer on or before the first day of February, nineteen hundred thirty-four, the bonds of such town for forty per centum of the deficiencies paid to the supervisor pursuant to this section and also for forty per centum of all sums advanced, exclusive of tax collections, on tax rolls levied prior to nineteen hundred thirty-two."

Section 4 provides that towns may deliver their bonds to the county in lieu of the payments provided for in the preceding sections.

Section 5 provides for the disposition of late tax collections. Other sections following provide for the methods of future financing of these various payments by both the town and county. " The fact that the statute in question is retroactive does not make it unconstitutional." (*Matter of Pardee* v. *Rayfield, supra; People ex rel. Eckerson* v. *Board of Education*, 126 App. Div. 414; affd., 193 N. Y. 601; *Brearley School* v. *Ward*, 201 id. 358, 363; *People ex rel. Clark* v. *Gilchrist*, 243 id. 173.)

The Court of Appeals, Judge CARDOZO writing, has said: " The methods and subjects of taxation are matters of governmental

policy. What the Legislature determines in respect of policy, it is also competent to change. The changes may work backwards as well as forwards. * * * Very likely the Legislature thought that the existing statute, [in this case the construction or the interpretation of the statutes in *Town of Amherst* v. *County of Erie, supra*], if properly construed, would have revealed the same conception at its core. The belief may have been error, yet in that event the need was all the greater for the adoption of a new system to the end that the conception might prevail. * * * The Constitution does not prohibit readjustment of the public burdens in the pursuit of ends so high." (*People ex rel. Clark* v. *Gilchrist, supra*, p. 185.)

" The legislature may control the management and disposition of municipal funds raised by taxation." (12 C. J. § 628.)

A long line of similar decisions sustain the authority of the Legislature to enact the statute in question. Unquestionably it renders the holding of the *Town of Amherst Case (supra)* inapplicable to Monroe county in so far as future deficiencies in town tax collections are concerned.

It does not, however, terminate the present action. Its section 12 provides that sections 195 and 196 of the Town Law (relating to debt limit) and chapter 634 of the Laws of 1932, and all amendments thereto (the new Town Law effective January 31, 1934), " shall not apply in any manner to any indebtedness incurred under the authority of this act, and all other acts or parts of acts inconsistent herewith are hereby repealed insofar as they apply to the county of Monroe and the towns in the county of Monroe." " The repeal of a statute by implication is not favored by law, for when the Legislature intends to repeal an act it usually says so expressly * * * When, however, two statutes are so hostile that both cannot stand, or the later covers the entire ground of the earlier, or is obviously intended as a substitute therefor, the last enactment of necessity governs, for it is presumed to express the last intention of the lawmakers. In order to have this effect, the repugnancy must be so palpable that upon reading the two acts together it is obvious, without the aid of elaborate argument, that both could not have been intended to remain in force at the same time." (*Matter of Tiffany*, 179 N. Y. 455, 457.)

Under this rule the General Construction Law saves this action. Sections 93 and 94 of that law are:

" § 93. Effect of repealing statute upon existing rights. The repeal of a statute or part thereof shall not affect or impair any act done, offense committed or right accruing, accrued or acquired, or liability, penalty, forfeiture or punishment incurred prior to the

time such repeal takes effect, but the same may be enjoyed, asserted, enforced, prosecuted or inflicted, as fully and to the same extent as if such repeal had not been effected.

" § 94. Effect of repealing statute upon pending actions and proceedings. Unless otherwise specially provided by law, all actions and proceedings, civil or criminal, commenced under or by virtue of any provision of a statute so repealed, and pending immediately prior to the taking effect of such repeal, may be prosecuted and defended to final effect in the same manner as they might if such provisions were not so repealed."

By these sections plaintiff's right to aid from the county, together with its right to continue this action to a final determination, is preserved, although the judgment to be entered herein must be so modified and limited as to conform with subdivisions (b) and (c) of the new act, these being clearly inconsistent with that to which it would have been entitled prior to the date of its enactment.

To this extent the law, as it stands at the time of the decision, must be applied. (*People ex rel. Clark* v. *Gilchrist, supra,* p. 180.)

Section 110 of the General Construction Law is not overlooked but there being no specific repeal nor entire repeal by inconsistency of plaintiff's rights existing prior to October 19, 1933, that section does not interfere with the determination reached by the referee on this subject. The statute, while repealing as to the future, does no more than to limit and make provisional plaintiff's remedy for past transactions.

Subsequent to the close of the evidence, the answer and supplementary answer were, by stipulation, amended so as to allege that plaintiff's claims have been satisfied and discharged by payment. It is admitted that the moneys turned over by the county of Monroe, or its treasurer, to the plaintiff town on account of the uncollected taxes, were paid under an agreement that in the event it was determined by the court that the town was not entitled to recover, the same should be returned to the county treasury with interest. There was no agreement that they were absolute payments on account. Quite the contrary. They were admittedly involuntary and their legal effect was expressly held open. It is now too late for defendants to shift their position.

Therefore, the referee holds that the moneys were advances pursuant to the agreement, adjustment for which must be made in connection with the judgment herein. In such adjustment plaintiff is entitled to recover interest from the date of the respective tax returns on the levies for the years 1931 and 1932 (including interest on the money borrowed by plaintiff upon certificates of indebtedness in anticipation of the collection of taxes prior to 1932 to June 1,

1933) to the dates on which such advances were made to the town.

Chapter 833 of the Laws of 1933 makes no reference to the county's liability for interest on deferred payments of deficiencies in town collections. Before that law became effective, the county could not successfully deny that liability. The town was entitled to receive from the county the amount of the deficiency when the collector's returns were made and under well-understood rules delayed payments draw interest. Its right to recover such interest in this action is preserved to it by section 93 of the General Construction Law.

Findings, in accordance with the foregoing, may be submitted.

Plaintiff is entitled to costs of the action. Application by the defendants, or any of them, for costs may be made to the referee at any time before the entry of judgment, on five days' notice.